Docket No. 104096.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ALAN
BEAMAN, Appellant.

*Opinion filed May 22, 2008.*

JUSTICE KILBRIDE delivered the judgment of the court, with
opinion.

Chief Justice Thomas and Justices Freeman, Fitzgerald, Garman,
Karmeier, and Burke concurred in the judgment and opinion.

## OPINION

The petitioner, Alan Beaman, appeals the dismissal of his
postconviction petition. His petition stems from a first degree murder
conviction (720 ILCS 5/9–1 (West 1992)), and sentence of 50 years.
The appellate court affirmed his conviction on direct appeal. No.
4–95–0396 (1996) (unpublished order under Supreme Court Rule 23).
Petitioner then filed his postconviction petition alleging several
violations of his constitutional rights. The circuit court of McLean
County dismissed the petition following an evidentiary hearing, and
the appellate court affirmed the dismissal. 368 Ill. App. 3d 759. We
allowed petitioner's petition for leave to appeal. 210 Ill. 2d R. 315(a).

On appeal to this court, petitioner asserts several claims, including
that the State violated his constitutional right to due process of law by

failing to disclose information about a viable alternative suspect in the murder. We conclude that the State violated petitioner's right to due process under *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), by failing to disclose material information about the alternative suspect. Accordingly, we reverse the judgments of the circuit and appellate courts and remand this matter to the circuit court for a new trial.

## I. BACKGROUND

Jennifer Lockmiller, an Illinois State University student, was found dead in her apartment in Normal, Illinois, on August 28, 1993. A clock radio electrical cord was wrapped around her neck, and she had been stabbed in the chest with scissors. Her shirt and bra were pushed up around her neck, and her shorts and underwear were pulled down. A box fan was lying across her face.

Seven fingerprints were recovered from the clock radio. Two of the fingerprints were from petitioner, four belonged to Jennifer's boyfriend Michael Swaine, and one was unidentified. Based on the crime scene and Jennifer's class schedule, the State argued that the time of death was shortly after 12 p.m. on Wednesday, August 25, 1993. In a bill of particulars, the State asserted the murder occurred between 12 p.m. and 2 p.m. on that date.

Prior to trial, the State filed a motion *in limine* seeking to exclude evidence of Jennifer's relationships with men other than petitioner and Michael Swaine. The State argued that petitioner should not be allowed to offer alternative-suspect evidence unless he could establish it was not remote or speculative. The prosecutor informed the court that the State did not possess nonspeculative evidence of a third-party suspect. The court reserved ruling on the motion.

Before the jury trial, the prosecutor and defense counsel discussed Jennifer's relationship with a person identified as John Doe. The prosecutor informed the court that Doe had "nothing to do with this case." Petitioner conceded that he did not have any specific evidence showing that another person committed the offense. The trial court then granted the motion *in limine*, ruling that petitioner could not present any evidence of an alternative suspect.

At trial, petitioner testified that he began dating Jennifer in July of 1992. During the following year, petitioner and Jennifer ended and then restarted their relationship a number of times. Petitioner was a student at Illinois Wesleyan University in Bloomington during that time. He often used Jennifer's clock radio to wake up for class. In several letters to Jennifer, petitioner expressed his desire to have a monogamous relationship. The letters indicated that petitioner believed Jennifer was involved with other men.

During the spring semester of the 1993 school year, Jennifer's neighbor heard petitioner pounding on Jennifer's door late at night on several occasions. He also heard petitioner and Jennifer yelling at each other. Petitioner testified that one night in the spring of 1993, Jennifer called and told him that she wanted to end their relationship. He went to Jennifer's apartment to get his compact disc player. When he arrived, he saw John Doe's car in the parking lot. Petitioner pounded on the door to Jennifer's apartment, but she refused to let him inside. Petitioner continued pounding and kicking the door until it broke. After he discovered Jennifer and Doe inside, he took his compact disc player from the apartment and left. Petitioner was yelling while inside the apartment, but he did not touch either Jennifer or Doe.

Additionally, Jennifer and petitioner's roommate, Michael Swaine, began a relationship during the summer of 1993. One night in early July, petitioner suspected that Swaine was at Jennifer's apartment. Petitioner pounded and kicked the door until it broke. He entered the apartment, but could not find Swaine. Petitioner did not touch Jennifer, but confronted her verbally and left after 30 to 45 minutes.

On July 25, 1993, petitioner searched Swaine's room and discovered letters that Jennifer had written to Swaine. Petitioner located Swaine and screamed at him about "seeing" Jennifer. Petitioner then went to Jennifer's apartment, pounded on her door, and when she let him inside, he confronted her by reading the letters. Petitioner emptied a bathroom garbage can on the floor looking for used contraceptives. He left after 15 to 20 minutes. At that point, petitioner considered the relationship to be over.

Petitioner traveled to Cincinnati with a friend that day. While he was in Cincinnati, petitioner talked to Jennifer and Swaine by

-3-

telephone. Petitioner returned to Normal on August 4, 1993. He stopped at Jennifer's apartment, had a short conversation with her, and drove her to class before saying goodbye. Petitioner then moved back to his parents' home in Rockford, Illinois.

Jennifer called petitioner at his home in Rockford several times, including a call on August 23, 1993. Petitioner testified that Jennifer asked him if they could get back together when the school year began. Petitioner told her "[n]o, we're through," and hung up the telephone. Petitioner's parents testified that petitioner stated Jennifer wanted him to visit her, but petitioner denied that she invited him.

After Jennifer's body was found in her apartment, police detectives interviewed petitioner several times. Petitioner stated he had not seen Jennifer since August 4. When he was asked to account for his activities between August 23 and August 27, petitioner began with August 25. Petitioner wrote that he went to a church function at 7 p.m., followed by a church music rehearsal, and a party. Petitioner then went to Monday, August 23, and wrote, "Jen called, I hung up, about five minutes." Petitioner then filled out the rest of the week. The date of Jennifer's murder had not been announced publicly at that time. Petitioner denied any involvement in the murder.

Petitioner presented evidence that his car was driven 322 miles between August 24 and August 30. That mileage figure was based on an odometer reading on a receipt from Sears, where petitioner purchased tires on August 24, and a photograph of the odometer taken by petitioner's mother on September 1. Petitioner also presented testimony that he drove 305.6 miles that week in his daily activities in Rockford to show that he could not have driven approximately 140 miles to Normal on August 25. The parties presented conflicting testimony on whether petitioner's odometer had been subject to tampering.

Petitioner also testified that he worked a night shift at his uncle's grocery store, ending at 9 a.m. on August 25. He went home, picked up some cash and a check, and drove to his bank to make a deposit. A bank security videotape showed petitioner leaving the bank at 10:11 a.m. After returning from the bank, petitioner went to sleep in his room until approximately 5 p.m.

Telephone records showed that calls were made from the Beaman residence to their church at 10:37 a.m. and to Mitchell Olson's residence at 10:39 a.m. Olson was the church's director of music and youth ministries. The evidence showed that only petitioner or his mother, Carol Beaman, could have made those calls. Petitioner testified that he did not remember making the calls, but it was "entirely possible" that he made them.

Olson testified that petitioner occasionally played music during church services and they had scheduled a rehearsal for the evening of August 25. Olson did not recall speaking with anyone in petitioner's family that morning, but remembered speaking with Carol Beaman when he called the residence around 2:30 or 3 p.m.

Carol Beaman testified that she did not make the phone calls from her residence at 10:37 and 10:39 a.m. She left home around 7 o'clock that morning. She drove to Independence Village, her mother's assisted-living facility, and took her mother to a clinic for blood tests. They returned to Independence Village at 10 a.m. Carol spent 15 to 20 minutes taking her mother to her room and helping her get settled. She then went to a Wal-Mart store located directly across the street. She checked out at 11:10 a.m., as shown by her receipt. The receipt indicated that she purchased copy paper, poster frames, magazine holders, and blue jeans.

After leaving Wal-Mart, she went to other stores. Her final stop was at a grocery store where she checked out at 2:03 p.m. She went directly home because she had perishable items. She subsequently timed the drive from the grocery store to her residence at 9 to 13 minutes. Accordingly, she testified that she arrived home by 2:16 p.m. However, she previously informed police officers that she arrived home around 3 p.m. When she arrived, petitioner's car was in the driveway and his dog was sitting in front of his bedroom door. She woke petitioner for dinner at approximately 6 p.m.

Normal Police Detective Timothy Freesmeyer testified about drive times and distances relevant to defendant's opportunity to commit the murder. Freesmeyer testified that the distance from petitioner's bank to Jennifer's apartment was 126.7 miles. Freesmeyer's drive time test indicated that petitioner could have arrived at Jennifer's apartment just before noon if he left the bank at 10:11 a.m. and drove 10 miles per hour over the speed limit. The

distance from petitioner's home to Jennifer's apartment was 139.7 miles. Petitioner could have driven from Jennifer's apartment to his residence in Rockford in just under two hours, driving 10 miles per hour over the speed limit.

Freesmeyer further testified that it took him 31 minutes while observing all speed limits to drive the route through downtown Rockford that petitioner "would have taken from Bell Federal Bank to his residence." Freesmeyer testified that driving through downtown Rockford was the "most direct route." Freesmeyer explained that he performed the time trial to "see if it was possible" for petitioner to make the phone call from his residence at 10:37 a.m. Freesmeyer concluded that petitioner would have arrived home at 10:42 a.m. if he left the bank at 10:11 a.m. and made the 31-minute drive. Freesmeyer also testified that it took him 15 minutes to drive from the Beaman residence to the Wal-Mart where Carol shopped on August 25.

On cross-examination, Freesmeyer acknowledged that petitioner never stated he drove through downtown Rockford on August 25. Freesmeyer agreed that the route he tested went "directly through the heart of downtown Rockford" as opposed to "the high speed bypass" around the city.

In terms of other possible suspects, the State presented evidence that Swaine was working at his former high school's bookstore in Elmhurst, Illinois, on August 25. Jennifer's former long-term boyfriend, Stacey Gates, also known as "Bubba," testified that he was employed as a teacher in Peoria, Illinois, and he worked that day.

In closing argument, the State maintained that the evidence clearly established petitioner's motive and opportunity to commit the offense. According to the State, petitioner drove to Normal after he left the bank at 10:11 a.m., arriving at around noon. When he walked into Jennifer's apartment, he saw Swaine's property. At that point, he "snapped" and committed the murder. Petitioner left the apartment by 12:15 p.m. and drove back to Rockford, arriving home around 2:10 p.m. The State argued that petitioner's guilt was also shown by his immediate focus on August 25 when asked to account for his time that week.

The State further argued that petitioner did not make the telephone calls from the Beaman residence at 10:37 and 10:39 a.m.

According to the State, Carol Beaman could have driven home after taking her mother back to Independence Village, placed the calls, and then driven back to Wal-Mart. The State concluded that the circumstantial evidence "weaves around this defendant a web *** that's so powerful that you can rest assured that you have the right person here."

Defense counsel responded that the evidence against petitioner was almost nonexistent, and the State had improperly focused its investigation on him to the exclusion of other potential suspects. Defense counsel explained that petitioner began with the evening of August 25 in accounting for the week because certain events stood out in his memory that day, including a church event, his music rehearsal, and a party. The rest of the week was, for the most part, routine. Counsel argued that the evidence against Swaine was as strong as the evidence presented against petitioner. Counsel concluded that the State failed to prove petitioner guilty beyond a reasonable doubt.

In rebuttal, the prosecutor defended the State's investigation. He argued, "Alibis, we proved up everybody else's, but–we just jumped right in there and cleared all these other people, and we just didn't do the same for him." The prosecutor further argued, "Did we look at Mr. Swaine? You bet we did. Did we look at Bubba? You bet we did. Did we look at a lot of people and interview a lot of witnesses? You bet we did. And guess who sits in the courtroom *** with the gap in his alibi still unclosed even after all this?" The prosecutor asserted that the "web of circumstantial evidence unmistakably, undeniably, beyond any doubt" tied petitioner to the murder, and again asked the jury to return a guilty verdict.

The jury found petitioner guilty of first degree murder and the trial court sentenced him to 50 years' imprisonment. The appellate court affirmed the trial court's judgment with one justice dissenting. The dissenting justice found the evidence insufficient to prove petitioner guilty beyond a reasonable doubt. No. 4–95–0396 (unpublished order under Supreme Court Rule 23) (Cook, J., dissenting).

Petitioner then filed a postconviction petition with the assistance of counsel. Counsel filed several amendments to the petition. In its final form, petitioner alleged in pertinent part that: (1) his trial

attorneys were ineffective for failing to investigate and present additional evidence establishing that he did not have the opportunity to commit the murder; (2) the State violated his constitutional right to due process of law under *Brady* by failing to disclose material information supporting John Doe's viability as a suspect; and (3) the State violated his right to due process of law by presenting false and misleading testimony from Detective Freesmeyer on the drive time from the bank to petitioner's residence. The trial court denied the State's motion to dismiss the petition and set the matter for an evidentiary hearing.

At the evidentiary hearing, retired Normal Police Lieutenant Tony Daniels testified about the John Doe evidence. Doe and Jennifer had previously been involved in a romantic relationship. He lived in Bloomington, approximately 1½ miles from Jennifer's apartment. Daniels testified that it would take Doe four to six minutes to drive to Jennifer's apartment and back. Doe told police officers that he and Jennifer were about to renew their relationship before her death. Jennifer and Michael Swaine came to his apartment a few days before the murder. Doe stated that he had supplied Jennifer with marijuana and other drugs, and she owed him money.

Daniels interviewed Doe twice in early September 1993 and found him to be "somewhat evasive" and "very nervous." In his first interview, Doe stated that he went out of town on August 24, the day before the murder. In the second interview a few days later, Doe informed Daniels that he did not leave Bloomington until 4 p.m. on August 25. He was in his apartment until 4 p.m. that day. Doe's girlfriend stated that she was with him from just after 1 p.m. until 4 p.m. that day. Doe did not provide any verification of his location before his girlfriend arrived around 1 p.m.

Daniels explained that he asked Doe to take a polygraph examination, but the examiner was unable to start the test because Doe failed to follow his directions. The polygraph examiner testified that the failure to follow the instructions could have been an intentional avoidance tactic. He further testified that Doe was being examined as a suspect in the murder. Daniels asked Doe to try again. Doe initially agreed, but the polygraph examination never occurred due to Doe's lack of cooperation.

Daniels further testified that Doe was charged with domestic battery and possession of marijuana with intent to deliver prior to petitioner's trial. A witness to the domestic battery indicated that Doe had his girlfriend on the floor and was elbowing her in the chest. Doe's girlfriend stated that Doe had physically abused her on numerous previous occasions. Additionally, she stated that Doe was using steroids, causing him to act erratically. Daniels testified that he considered Doe a viable suspect in the murder at the time of petitioner's trial, and he believed that Doe remained a viable suspect.

Petitioner's trial counsel testified that the undisclosed evidence included Doe's polygraph examination, his abuse of his girlfriend, his domestic battery charge, and his steroid use. He testified that he would have surely attempted to present Doe as an alternative suspect if that information had been disclosed.

Petitioner also presented testimony on his opportunity to commit the murder. Petitioner testified at trial that he used the bypass route around downtown Rockford on August 25, when he drove from his residence to the bank. Petitioner's investigator, hired for the postconviction proceedings, testified that he timed the bypass route three times. The drive time was around 22 minutes on each trip driving with the flow of traffic. He also drove two separate routes through downtown Rockford with the flow of traffic, and those trips took him 26 and 27 minutes. Petitioner's investigator also performed three time trials on the route Carol Beaman would have taken from Wal-Mart to her residence. Those trips took 19 or 20 minutes driving with the flow of traffic.

Carol Beaman testified in more detail about her shopping trip to Wal-Mart. First, she picked up paper for her photocopier. She then shopped for poster frames, comparing sizes, weights, and prices. She located plastic binders for her magazines. She also probably checked the prices of spiral notebooks and pocket folders for her thesis project, although she did not buy those items on that trip. In purchasing petitioner's blue jeans, she had to search for his size and his preferred style.

Additionally, Mitchell Olson testified that petitioner was scheduled to perform at church services on August 29, 1993. Olson had scheduled a rehearsal for the evening of August 25. He tried to confirm the rehearsal time earlier that day. Phone records showed a

call from the church to the Beaman residence at 10:22 a.m. Petitioner usually returned Olson's phone calls by calling the church, but petitioner also had Olson's home phone number. Olson testified that he only called the Beaman residence when he needed to reach petitioner. He did not remember ever receiving a phone call from Carol Beaman.

Following the evidentiary hearing, the circuit court concluded that petitioner had failed to establish his constitutional claims. On the ineffective assistance of counsel claim, the court found that trial counsel presented a vigorous defense on petitioner's alibi. His focus on the odometer evidence was a matter of trial strategy. Petitioner's attorney also presented some evidence on the availability of petitioner and his mother to make the telephone calls from their residence on the morning of August 25. Therefore, the circuit court concluded the record did not establish petitioner's claim of ineffective assistance of trial counsel.

The circuit court also denied petitioner's due process claim based on presentation of false or misleading evidence. The court found Detective Freesmeyer's testimony on the drive time from the bank to petitioner's residence was not false or misleading. Rather, the State simply presented factual information and argued for its version of the events.

The circuit court further concluded that petitioner's *Brady* claim failed because the undisclosed information on Doe's polygraph and his domestic battery charge was inadmissible at trial. Additionally, the court found that the evidence pointing to Doe as a viable suspect was remote and speculative. The court found that petitioner had "not provided enough evidence that if presented at the [motion *in limine* hearing], the trial court would have allowed the defense to present John Doe I as a suspect." The circuit court, therefore, denied the petition for postconviction relief.

The appellate court affirmed the circuit court's judgment. 368 Ill. App. 3d 759. The appellate court held that petitioner's due process claim that the State presented false and misleading testimony was forfeited because petitioner did not raise it on direct appeal. Even if it were not forfeited, the claim would fail because the trial court's ruling was not manifestly erroneous. The appellate court also held that the circuit court's decision on the ineffective assistance of

counsel claim was not manifestly erroneous. Counsel's decision to focus on mileage rather than drive times was a strategic choice that was not objectively unreasonable. Finally, the appellate court held that the evidence developed against Doe was too remote and speculative to connect him to the murder. The evidence, therefore, would not have been admissible to establish him as an alternative suspect. The appellate court concluded that petitioner's *Brady* claim failed because he could not establish a reasonable probability that the undisclosed evidence would have affected the outcome of the trial. 368 Ill. App. 3d at 772.

Justice Cook dissented, focusing on the *Brady* claim. 368 Ill. App. 3d at 773 (Cook, J., dissenting). Justice Cook noted that the evidence against petitioner was entirely circumstantial and was similar to that against John Doe. He concluded that petitioner "should have been allowed to present the same type of evidence regarding Doe that the State presented against" him. 368 Ill. App. 3d at 774 (Cook, J., dissenting). Nondisclosure of the additional evidence against Doe was particularly damaging here because the prosecution introduced evidence of three suspects, petitioner, Swaine, and Gates, and argued petitioner was the only one who did not have an alibi. Thus, the prosecutor led the jury to believe that no one else had motive and opportunity to commit the murder. Justice Cook concluded that evidence of Doe as an alternative suspect would have been admitted if the State had disclosed the additional information. Justice Cook also disagreed with the circuit court's determination that the State did not present misleading testimony on the drive time from petitioner's bank to his residence. Accordingly, he concluded that petitioner's conviction should be reversed and the cause remanded for a new trial. 368 Ill. App. 3d at 778 (Cook, J., dissenting).


## II. ANALYSIS

On appeal to this court, petitioner renews his claims that: (1) he was denied due process of law by the State's failure to correct Detective Freesmeyer's testimony that it was not possible for petitioner to arrive home to make the telephone calls on the morning of the murder; (2) his trial attorney was ineffective because he failed to investigate and present available evidence tending to prove that petitioner made the calls from his residence on the morning of the

offense; and (3) his right to due process of law was violated by the State's failure to disclose material information about John Doe, who was a viable alternative suspect.

The Post-Conviction Hearing Act (725 ILCS 5/122–1 *et seq.* (West 2000)) provides a means for a criminal defendant to challenge his conviction or sentence based on a substantial violation of constitutional rights. *People v. Whitfield*, 217 Ill. 2d 177, 183 (2005). A postconviction proceeding is not an appeal from the judgment of conviction, but is a collateral attack on the trial court proceedings. *People v. Johnson*, 191 Ill. 2d 257, 268 (2000). To be entitled to postconviction relief, the petitioner must make a substantial showing of a constitutional violation. *People v. Coleman*, 206 Ill. 2d 261, 277 (2002). Issues decided on direct appeal are barred by *res judicata*; issues that could have been raised, but were not, are forfeited. *People v. Enis*, 194 Ill. 2d 361, 375 (2000).

In noncapital cases, the Act provides a three-stage process for adjudicating postconviction petitions. *People v. Harris*, 224 Ill. 2d 115, 125 (2007). In this case, the petition advanced to a third-stage evidentiary hearing. 725 ILCS 5/122–6 (West 2000). Following an evidentiary hearing where fact-finding and credibility determinations are involved, the trial court's decision will not be reversed unless it is manifestly erroneous. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). However, "[i]f no such determinations are necessary at the third stage, *i.e.*, no new evidence is presented and the issues presented are pure questions of law, we will apply a *de novo* standard of review, unless the judge presiding over postconviction proceedings has some 'special expertise or familiarity' with the trial or sentencing of the defendant and that 'familiarity' has some bearing upon disposition of the postconviction petition." *Pendleton*, 223 Ill. 2d at 473, citing *People v. Caballero*, 206 Ill. 2d 65, 87-88 (2002).

We first address petitioner's claim under *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), that the State violated his right to due process by failing to disclose material information on a viable alternative suspect. Petitioner argues that the State's evidence based on his motive and opportunity to commit the offense was entirely circumstantial. He contends there is a reasonable probability that the jury would have acquitted him had it known there was another suspect with motive and opportunity to commit the

murder. The State responds that the withheld evidence was not favorable to petitioner's defense or material to his guilt or punishment. Accordingly, the State argues petitioner's right to due process was not violated by the failure to disclose the evidence.

The circuit court heard testimony on the *Brady* claim at the evidentiary hearing and found that the evidence on Doe as a viable suspect was remote and speculative. In making that determination, the circuit court was required to weigh the evidence. Additionally, the assessment of materiality under *Brady* involves weighing the impact of the undisclosed evidence on the verdict. See *People v. Harris*, 206 Ill. 2d 293, 311 (2002). Accordingly, the *Brady* claim does not present a pure question of law. Rather, it requires applying established law to the facts, including those elicited at the evidentiary hearing. In these circumstances, we review the circuit court's decision for manifest error. See *People v. Morgan*, 212 Ill. 2d 148, 155 (2004). Manifest error is error that is "clearly evident, plain, and indisputable." *Morgan*, 212 Ill. 2d at 155.

In *Brady*, the Supreme Court held that the prosecution violates an accused's constitutional right to due process of law by failing to disclose evidence favorable to the accused and material to guilt or punishment. *Harris*, 206 Ill. 2d at 311, citing *Brady*, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196-97. This rule encompasses evidence known to police investigators, but not to the prosecutor. *Kyles v. Whitley*, 514 U.S. 419, 438, 131 L. Ed. 2d 490, 508, 115 S. Ct. 1555, 1568 (1995). To comply with *Brady*, the prosecutor has a duty to learn of favorable evidence known to other government actors, including the police. *Kyles*, 514 U.S. at 437, 131 L. Ed. 2d at 508, 115 S. Ct. at 1567. The Supreme Court has, therefore, noted "the special role played by the American prosecutor in the search for truth in criminal trials." *Strickler v. Greene*, 527 U.S. 263, 281, 144 L. Ed. 2d 286, 301-02, 119 S. Ct. 1936, 1948 (1999). The prosecutor's interest in a criminal prosecution " 'is not that it shall win a case, but that justice shall be done.' " *Strickler*, 527 U.S. at 281, 144 L. Ed. 2d at 302, 119 S. Ct. at 1948, quoting *Berger v. United States*, 295 U.S. 78, 88, 79 L. Ed. 1314, 1321, 55 S. Ct. 629, 633 (1935).

A *Brady* claim requires a showing that: (1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either

wilfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment. *People v. Burt*, 205 Ill. 2d 28, 47 (2001), citing *Strickler*, 527 U.S. at 281-82, 144 L. Ed. 2d at 302, 119 S. Ct. at 1948. Evidence is material if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed. *Harris*, 206 Ill. 2d at 311, citing *Kyles*, 514 U.S. at 434, 131 L. Ed. 2d at 506, 115 S. Ct. at 1566; *United States v. Bagley*, 473 U.S. 667, 682, 87 L. Ed. 2d 481, 494, 105 S. Ct. 3375, 3383 (1985). To establish materiality, an accused must show " 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *People v. Coleman*, 183 Ill. 2d 366, 393 (1998), quoting *Kyles*, 514 U.S. at 435, 131 L. Ed. 2d at 506, 115 S. Ct. at 1566.

In making the materiality determination, courts must consider the cumulative effect of all the suppressed evidence rather than considering each item of evidence individually. *People v. Hobley*, 182 Ill. 2d 404, 435 (1998), citing *Kyles*, 514 U.S. at 436-41, 131 L. Ed. 2d at 507-10, 115 S. Ct. at 1567-69. After a reviewing court has found a *Brady* violation, the constitutional error cannot be found harmless. *Coleman*, 183 Ill. 2d at 393, quoting *Kyles*, 514 U.S. at 436, 131 L. Ed. 2d at 507, 115 S. Ct. at 1567.

Here, the undisclosed evidence consists of four points: (1) John Doe failed to complete the polygraph examination; (2) Doe was charged with domestic battery and possession of marijuana with intent to deliver prior to petitioner's trial; (3) Doe had physically abused his girlfriend on numerous prior occasions; and (4) Doe's use of steroids had caused him to act erratically. Petitioner's attorney testified at the evidentiary hearing that he did not receive this evidence. In its brief to this court, the State does not dispute that it knew of the evidence and failed to disclose it. In fact, the State refers to the evidence as being "withheld." Accordingly, petitioner has established that the evidence was suppressed by the State.

The State, however, argues that the evidence was not favorable to petitioner or material to his guilt or punishment. Initially, we note that the circuit court held the State did not violate *Brady* by failing to disclose the polygraph evidence and the domestic battery charge because that evidence would not have been admissible at trial. In

addressing whether the undisclosed evidence was favorable to petitioner, however, we need not decide whether each of the individual items of undisclosed evidence would have been admissible at trial. In this case, petitioner's essential claim is that he could have used the undisclosed evidence, along with the disclosed evidence tending to show Doe's possible involvement in the offense, to present Doe as an alternative suspect. Thus, even if some of the undisclosed evidence would have been inadmissible at trial, it still may have been favorable to petitioner in gaining admission of critical alternative suspect evidence.

In determining whether the undisclosed evidence was favorable to petitioner, therefore, we must consider whether it would have assisted him in presenting Doe as an alternative suspect. An accused in a criminal case may offer evidence tending to show that someone else committed the charged offense. *People v. Kirchner*, 194 Ill. 2d 502, 539 (2000); *People v. Whalen*, 158 Ill. 2d 415, 430-31 (1994). Evidence of an alternative suspect should be excluded as irrelevant, however, if it is too remote or speculative. *Kirchner*, 194 Ill. 2d at 539-40; *Whalen*, 158 Ill. 2d at 431. Generally, evidence is relevant if it tends to make the existence of any fact in consequence more or less probable than it would be without the evidence. *Kirchner*, 194 Ill. 2d at 539.

The undisclosed evidence is clearly favorable to petitioner in establishing Doe as an alternative suspect. First, the circumstances of the polygraph examination indicate that Doe intentionally avoided the test. He did not comply with the polygraph examiner's instructions during the first attempt and failed to cooperate in scheduling a second attempt. Moreover, the polygraph examiner testified that the police had identified Doe as a suspect in the murder. Although the State argues that "the tenor of the police questioning supports the inference that police viewed Doe as a suspect," the State does not contend that the disclosed statements specifically identified him as a suspect. The undisclosed polygraph evidence would have bolstered a claim by petitioner that Doe was a viable suspect not only because the circumstances may be viewed as evasive, but also because the polygraph examiner indicated that Doe was specifically identified as a suspect.

The evidence that Doe was charged with domestic battery and had physically abused his girlfriend on many prior occasions also could have been used by petitioner at a pretrial hearing to establish Doe as a viable suspect. That evidence is relevant to Doe's likelihood to commit a violent act against his girlfriend. The evidence that Doe had physically abused his girlfriend on numerous occasions, together with the evidence that he was in the process of renewing his romantic relationship with Jennifer prior to her death, provided additional support of Doe as a viable suspect. Further, the undisclosed evidence of Doe's steroid abuse may have explained his violent outbursts toward his girlfriend and supported an inference of a tendency to act violently toward others.

Finally, the undisclosed evidence that Doe had been charged with possession of marijuana with intent to deliver could have been used by petitioner as part of Doe's motive to commit the murder. That evidence tends to establish Doe as a drug dealer and, with evidence of Jennifer owing Doe money for drugs, it could have been offered to support a motive to commit the murder.

In analyzing whether the undisclosed evidence is favorable to petitioner, we also note that the Supreme Court recently examined the constitutionality of a rule of evidence restricting a criminal defendant from introducing proof of "third-party guilt" in cases where the prosecution offered forensic evidence that, if believed, strongly supported a guilty verdict. *Holmes v. South Carolina*, 547 U.S. 319, 164 L. Ed. 2d 503, 126 S. Ct. 1727 (2006). In finding the rule of evidence unconstitutional, the Court concluded that "by evaluating the strength of only one party's evidence, no logical conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or cast doubt." *Holmes*, 547 U.S. at 331, 164 L. Ed. 2d at 513, 126 S. Ct. at 1735. This observation is applicable to whether the undisclosed evidence here is favorable and material. The impact or strength of the undisclosed evidence can only be determined by also viewing the strength of the evidence presented against petitioner.

Here, the State summarizes its evidence against petitioner as resting "on more than mere opportunity: petitioner's fingerprints were on the murder weapon; petitioner demonstrated knowledge of when Jennifer was murdered; and petitioner had every reason to kill

-16-

Jennifer when he arrived at her apartment and saw, for the first time, definitive proof that Jennifer and Swaine had been sleeping together." In our view, the State's evidence against petitioner was not particularly strong. The State essentially presented evidence of motive, evidence of opportunity that was strongly disputed by petitioner, inferences from petitioner's statements to police officers that he knew the date of the murder, and fingerprints on the clock radio that were explained by petitioner's relationship with Jennifer and made less important by the State's concession that it would not have been necessary to touch the clock radio in committing the murder. This evidence is tenuous and supports admission by petitioner of the similarly probative alternative suspect evidence on Doe.

We conclude that the evidence withheld by the State is favorable to petitioner because it supports Doe's viability as an alternative suspect. The combination of the undisclosed evidence with the disclosed evidence tending to establish Doe as a viable alternative suspect cannot be considered remote or speculative, particularly in light of the State's evidence against petitioner. The undisclosed evidence would have enabled petitioner to present evidence and argument on Doe as an alternative suspect.

Having found that the withheld evidence is favorable to petitioner, we must next determine whether it is material. As noted, evidence is material if there is a reasonable probability that the result would have been different had it been disclosed. *Harris*, 206 Ill. 2d at 311, citing *Kyles*, 514 U.S. at 434, 131 L. Ed. 2d at 506, 115 S. Ct. at 1566; *Bagley*, 473 U.S. at 682, 87 L. Ed. 2d at 494, 105 S. Ct. at 3383. An accused must show " 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *Coleman*, 183 Ill. 2d at 393, quoting *Kyles*, 514 U.S. at 435, 131 L. Ed. 2d at 506, 115 S. Ct. at 1566. Again, the impact of the alternative-suspect evidence on the verdict cannot be determined without viewing the strength of the evidence presented by petitioner as well as the evidence presented by the State. See *Holmes*, 547 U.S. at 331, 164 L. Ed. 2d at 513, 126 S. Ct. at 1735.

The State's evidence against petitioner showed that he had a motive to commit the murder based on his jealousy. Additionally, the

State established that petitioner had been violent toward objects, but not people, on several occasions during his involvement with Jennifer. The evidence of petitioner's opportunity to commit the offense was strongly disputed. In closing argument, the State contended that petitioner drove to Normal after leaving the bank at 10:11 a.m. He arrived at around noon. He saw Swaine's property when he walked into Jennifer's apartment. He immediately "snapped," committed the murder, and left the apartment by 12:15 p.m. He then drove back to Rockford, arriving home around 2:10 p.m. The State's timeline depended on petitioner driving 10 miles per hour over the speed limit to Normal and back to Rockford. Additionally, the timeline required petitioner to commit the offense and stage the crime scene in an extremely quick and efficient manner. Petitioner strongly contested the State's opportunity evidence. It is clear that the evidence of petitioner's opportunity to commit the murder is not as strong as that against Doe.

The State's other evidence against petitioner was based on inferences from his statements to police officers and his fingerprints on the clock radio. That evidence, however, was explained by petitioner. Petitioner explained that he began with August 25 in accounting for his time the week of the murder because he had events that day that stood out in his memory. The rest of the week was routine. Petitioner consistently denied any involvement in the murder. Petitioner's fingerprints on the clock radio could have been explained by his prior relationship with Jennifer. Additionally, his fingerprints were not the only ones found on the clock radio. In fact, there was a least one print that was unidentified. Further, the prosecutor conceded in his rebuttal that the murder could have been committed by grabbing the cord and not touching the clock radio. We conclude that petitioner's statements and his fingerprints did not provide particularly strong evidence of his guilt.

We also note that the State's argument relied upon the assertion that all other potential suspects had been eliminated from consideration. The prosecutor informed the jury that the State had "proved up everybody else's" alibi and petitioner was the one "who sits in the courtroom *** with the gap in his alibi still unclosed." The prosecution presented testimony to establish the alibis of two named suspects, Swaine and Gates. The prosecution's argument that all other

potential suspects had been eliminated from consideration was a key part of the State's case given the tenuous circumstantial evidence of petitioner's guilt.

Based on this record, we conclude that the evidence of Doe as an alternative suspect is material. The evidence presenting Doe as a viable alternative suspect without an alibi would have been critical because it countered the State's argument that all other suspects had established alibis.

Moreover, petitioner could have established Doe as a strong alternative suspect. First, petitioner could have argued that Doe had a motive to commit the murder based on jealousy over his encounter with Jennifer and Swaine at a time when Doe was renewing his romantic relationship with Jennifer. Doe may have also had a motive to commit the offense based on his status as a drug dealer and Jennifer's drug debt. Doe had a clear opportunity to commit the offense. He lived approximately 1½ miles from Jennifer's apartment and did not have any verification of his location before 1 p.m. on the day of the murder.

Further, retired Normal Police Lieutenant Tony Daniels testified that Doe was "somewhat evasive" and "very nervous" during his interviews. The polygraph examiner testified that Doe was viewed by police as a suspect. Doe initially gave a false alibi stating he left town the day before the murder. That false exculpatory statement could be used as probative evidence of consciousness of guilt. See *People v. Milka*, 211 Ill. 2d 150, 181 (2004). Petitioner may have also been able to use some of the other undisclosed evidence to bolster his claim of Doe as an alternative suspect. We need not decide whether that evidence could have been presented, however, because the evidence discussed above is sufficient to establish Doe as a viable alternative suspect.

In this case, the evidence of Doe as an alternative suspect was crucial for petitioner because it countered the State's circumstantial evidence against him and rebutted the State's argument that all other potential suspects had established alibis. We conclude that there is a reasonable probability that the result of the trial would have been different if petitioner had presented the evidence establishing Doe as an alternative suspect. We cannot have confidence in the verdict finding petitioner guilty of this crime given the tenuous nature of the

circumstantial evidence against him, along with the nondisclosure of critical evidence that would have countered the State's argument that all other potential suspects had been eliminated from consideration. Accordingly, we conclude that the State's suppression of the withheld evidence violated petitioner's constitutional right to due process under *Brady*. Based on this record, the circuit court's dismissal of petitioner's *Brady* claim was manifest error.

A *Brady* violation cannot be found harmless. *Coleman*, 183 Ill. 2d at 393, quoting *Kyles*, 514 U.S. at 436, 131 L. Ed. 2d at 507, 115 S. Ct. at 1567. Petitioner's conviction must, therefore, be reversed and the matter remanded for further proceedings. Based on our resolution of the *Brady* claim, it is unnecessary to address petitioner's due process claim that the State failed to correct misleading testimony from Detective Freesmeyer or his claim of ineffective assistance of counsel.

As a final matter, we note that on direct appeal the appellate court held the evidence was sufficient to convict petitioner of this offense. Petitioner does not raise any claim based on the sufficiency of the evidence in this court. Accordingly, there is no double jeopardy impediment to a new trial. See *People v. Wheeler*, 226 Ill. 2d 92, 134 (2007).

### III. CONCLUSION

For the foregoing reasons, we conclude that the State violated petitioner's constitutional right to due process of law. Petitioner's conviction must be reversed based on that constitutional violation. We therefore reverse the judgments of the appellate and circuit courts, vacate petitioner's conviction, and remand to the circuit court for further proceedings.

*Judgments reversed;*
*cause remanded.*