2021 IL App (1st) 191150-U

No. 1-19-1150

Order filed August 16, 2021

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 92 CR 13556 |
| | ) | |
| CHEZERAY MOORE, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COGHLAN delivered the judgment of the court.
Justices Hyman and Pierce concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The circuit court properly denied leave to file a successive postconviction petition where defendant failed to establish cause and prejudice for his claim that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963).

¶ 2    Defendant Chezeray Moore appeals from the circuit court's denial of leave to file a successive petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)). Defendant argues that he established cause and prejudice to bring a successive petition alleging that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963). We affirm.

¶ 3    Defendant, Henry Lovett, Amotto Jackson, and Timothy Mobley were charged with multiple offenses arising from the murder of Kristin Ponquinette. Following a separate jury trial, defendant was found guilty of first degree murder and sentenced to an extended term of 100 years' imprisonment. We recount the facts only to the extent necessary to resolve the issues in this appeal.

¶ 4    The evidence at trial established that, on the morning of April 26, 1992, Gary Kmetty, a member of the United States Coast Guard Reserve, removed Ponquinette's body from the Cal Sag Channel near 127th Street and Cicero Avenue. Ponquinette had drowned, her feet were bound with green wire, and she had lacerations on her skull and a stab wound in her side. A sewer cover was later found in the channel with the same green wire attached, and a rock with blood spatters and hair was also found nearby. It could not be determined whether the blood on the rock belonged to Ponquinette because the sample from her body had degraded. The hairs were consistent with Ponquinette's and inconsistent with defendant's.

¶ 5    Carin Smith testified that she and Sharon Burke went to the home of Cassandra Butler[1] on a Friday afternoon in mid-April 1992. Ponquinette was there, and Burke and Cassandra bound, gagged, and slapped Ponquinette, and cut Ponquinette's hair. Smith left, but returned shortly after, and defendant, Venus Beckom,[2] and others were present. Burke ungagged and untied Ponquinette. Cassandra's brother, Daniel Butler, ordered everyone to leave, and Ponquinette left with defendant.

_____

[1] In the record, Cassandra Butler's first name is also spelled Kassandra. Because Cassandra Butler and another individual, Daniel Butler, share a surname, we refer to them by their first names.
[2] Venus Beckom's last name is also spelled Becom in the record. We adopt the spelling from her testimony.

¶ 6    On cross-examination, Smith testified that, when she and Burke saw Beckom after leaving the Butler home, Beckom bragged and laughed about beating Ponquinette. After Ponquinette's body was found, Beckom bragged and laughed at school about her role in Ponquinette's death.

¶ 7    Beckom testified that she went to Cassandra's home and Cassandra, Smith, Burke, Jackson, defendant, and Ponquinette were present. Everyone was affiliated with a gang called the Black Stones, and Beckom informally led the female branch. Ponquinette's hair had been cut, she had red rings around her wrists, and she appeared to have been crying. When Daniel ordered everyone to leave, Ponquinette left with the men. Sonya Richardson and LaShonda Wilson then arrived and asked where Ponquinette was. Burke and Cassandra told them she was at defendant's garage, and Beckom went there with Richardson and Wilson.

¶ 8    Defendant and Ponquinette were in defendant's garage. Richardson told Ponquinette she would make Ponquinette "suck all the brothers' d***" because of something Ponquinette had said about Richardson, and Beckom walked to a nearby school to tell the male gang members. Beckom returned to defendant's garage with Jackson, and defendant's mother told the group to leave. The group went to the school playground, where they met Mobley and Charles Carpenter. Beckom asked Ponquinette if Ponquinette had a relationship with Beckom's boyfriend, and Beckom and Wilson beat Ponquinette for about five minutes, until Jackson pulled Beckom off Ponquinette and took Ponquinette away.

¶ 9    Beckom overheard Mobley, who was a higher-ranking gang member than defendant, tell a group that included defendant, "we have to get rid of [Ponquinette], we have to kill her or something, get her away from here, she had already been in one [gang meeting], she knows too much." Defendant stayed, but Beckom left and later saw Smith and Burke at a restaurant.

¶ 10    Beckom acknowledged that she was arrested and charged in juvenile court with aggravated battery and unlawful restraint for beating Ponquinette. The charges had been dismissed, and in exchange for her testimony, would be reinstated in juvenile court and the State would recommend probation upon her guilty plea.

¶ 11    On cross-examination, Beckom agreed that she laughed and bragged about beating Ponquinette in front of Smith, but denied laughing and bragging at school after Ponquinette's body was found. Beckom acknowledged that she initially lied to the police that she had not participated in the beating. Beckom denied stating at the playground that she wanted Ponquinette killed because Ponquinette had been with her boyfriend. Defendant never spoke. Beckom confirmed that she believed she would not be charged in connection with the murder.

¶ 12    Daniel testified that, at the time of trial, he was on probation for delivery of a look-alike substance and had a pending charge of unlawful use of weapons by a felon. After he told the group to leave his house, Daniel went to defendant's garage, where Wilson and Richardson hit Ponquinette. Defendant's mother told everyone to leave, and the group went to the school.

¶ 13    Beckom and Wilson beat Ponquinette, then Daniel and Wilson left the playground. When they returned about 20 minutes later, Daniel was told that Ponquinette had walked towards the "black bridge," where the gang would meet. Daniel and Wilson walked to the bridge, passing Jackson, who stated he was getting a sewer top. On the bridge, Ponquinette was lying with her hands and feet tied. Defendant sat 10 or 15 feet away, and Lovett was also present. Daniel and Wilson left two or three minutes later, and passed Jackson returning with a sewer cap. Daniel and Wilson walked to a bus stop, and about 15 minutes later, defendant, Jackson, and Lovett approached. Jackson appeared to have blood on his clothes and mumbled that he "sunk the b***."

¶ 14    On cross-examination, Daniel identified a summary of a statement he gave defense counsel indicating that he lied to the grand jury that he saw defendant and Ponquinette on the bridge, and testified that the police pressured him into stating what they wanted to hear. He told the police that it was two days later that he heard Jackson state that he "sunk the b***." However, he testified that he saw Ponquinette on the bridge with defendant. Daniel acknowledged that he was told he could be charged with murder but that, after his testimony, he would not be.

¶ 15    On redirect examination, Daniel testified that he did not sign the statement he gave defense counsel, told the grand jury and police the truth, testified truthfully, and was not testifying voluntarily. On recross examination, Daniel testified that his attorney instructed him not to sign the statement because he had a pending felony case, and the prosecutor told him that he would be charged with perjury if he did not testify consistently with his grand jury testimony. On further redirect, Daniel confirmed that the prosecutor stated he could face perjury charges if he lied and instructed Daniel to testify truthfully.

¶ 16    Wilson testified that Richardson beat Ponquinette in defendant's garage, and Wilson, Richardson, and Beckom hit Ponquinette at the playground. Wilson and Daniel left the playground, and a short time later walked towards the bridge. There, defendant approached and stated, "[W]e hit the b*** in the head with bricks, and she still wouldn't die." Ponquinette was lying on the bridge in the fetal position with her hands and feet tied. Lovett told Wilson to leave if she "didn't [want] to see this." Defendant had moved to stand beside Ponquinette. Wilson and Daniel left, and Jackson returned to the bridge carrying a sewer cover. As Wilson and Daniel waited at the bus stop, defendant, Jackson, and Lovett arrived, and defendant and Jackson were "excited." Wilson

acknowledged that she had been charged with aggravated battery and unlawful restraint for beating Ponquinette, and that in exchange for her testimony, the State would recommend probation.

¶ 17    Carpenter testified that, at the time of trial, he was on probation for possession of a controlled substance and a violation of probation for not reporting had been filed against him. Carpenter was at the playground while Ponquinette was beaten, but left with Daniel and Wilson to avoid involvement. Carpenter identified a written statement he signed and gave police which provided that he stood in a group with defendant, Jackson, Daniel, and Mobley, and Mobley said, "Kill the b***." On cross-examination, however, Carpenter testified he did not hear that and felt like he had to sign the statement for the police to leave him alone.

¶ 18    Illinois State Police sergeant James Turner testified that he interviewed Carpenter, who stated that, two days after the murder, he heard Jackson tell Daniel that he "sunk the b***."

¶ 19    Defendant testified that he belonged to the gang, was in Daniel's basement, and when he was told to leave, took Ponquinette to his garage. He tried to help Ponquinette and gave her bus fare to return home. He went to the school when his mother asked everyone to leave the garage, but he left soon after and denied being present when Ponquinette was murdered.

¶ 20    On cross-examination, defendant testified that he knew Ponquinette had been slapped and her hair had been cut when he saw her in Daniel's basement, but he did not believe she was in danger at the playground. He denied being at the black bridge or telling Wilson that he hit Ponquinette in the head with bricks.

¶ 21    In rebuttal, assistant State's Attorney Michael Baumel testified that defendant told him he was at the black bridge the night of the murder, but did not answer any questions regarding his involvement.

¶ 22    The jury found defendant guilty of first degree murder, and the trial court imposed an extended term of 100 years' imprisonment. We affirmed on direct appeal. *People v. Moore*, No. 1-94-1195 (1996) (unpublished order under Illinois Supreme Court Rule 23).

¶ 23    On February 28, 1997, defendant filed a *pro se* petition for relief under the Act. The circuit court summarily dismissed the petition, and we affirmed, allowing appellate counsel leave to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). *People v. Moore*, No. 1-97-2398 (1998) (unpublished order under Illinois Supreme Court Rule 23).

¶ 24    On June 7, 1999, defendant filed a successive *pro se* petition for postconviction relief. The circuit court dismissed the petition. Defendant filed motions for reconsideration and to supplement the petition, attaching an affidavit from Daniel averring he testified falsely; the circuit denied the motions and we affirmed. *People v. Moore*, No. 1-99-3994 (2001) (unpublished order under Illinois Supreme Court Rule 23).

¶ 25    On August 16, 2000, defendant filed a petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2000)). On March 13, 2003, he filed a *pro se* "Supplement to Petition for Post-Conviction Relief and Motion to Allow DNA [T]esting on Biological Evidence." Following a hearing on October 21, 2005, the circuit court denied the motion for DNA testing. On December 16, 2005, the circuit court dismissed defendant's section 2-1401 petition. Defendant appealed both orders, and we affirmed. *People v. Moore*, No. 1-06-0318 (2008) (unpublished order under Illinois Supreme Court Rule 23).

¶ 26    While that appeal was pending, defendant filed another successive postconviction petition which the circuit court summarily dismissed; we affirmed and allowed appellate counsel leave to

withdraw. *People v. Moore*, No. 1-06-1952 (2007) (unpublished order under Illinois Supreme Court Rule 23).

¶ 27    On February 12, 2019, defendant filed the instant *pro se* motion for leave to file a successive postconviction petition. Defendant alleged, *inter alia*, that the State committed a *Brady* violation when it failed to disclose that, in September 1993, Beckom was arrested with suspect crack cocaine but was not charged because she was a cooperating witness in the murder trials. This evidence, according to defendant, could have been used to impeach Beckom. Defendant further alleged that Beckom testified falsely about the extent of the benefits she received in exchange for her testimony.

¶ 28    Defendant attached an affidavit, dated July 11, 2013, from Charles Hill, a former Riverdale police officer. Hill averred that, in September 1993, he arrested Beckom for possessing several baggies of suspect crack cocaine. Beckom stated that her father was a Chicago police officer and she would "be out in no time." When Hill learned at the station that Beckom was a juvenile, he placed her in an interrogation room. About 90 minutes later, Hill's shift commander explained that Beckom would not be charged because she was cooperating in murder trials. Hill spoke on the phone with the prosecutor, who advised that Beckom was cooperating and had agreed to a plea deal, her case would be revisited later, and the prosecutor would speak with Beckom's father, whom the prosecutor knew personally. Beckom's father then picked her up from the station. To Hill's knowledge, the arrest and report number were never logged. In 2011, Hill met Mobley while both were incarcerated. In March 2013, Hill helped Mobley review a document in Jackson's case, and advised Mobley that he knew Beckom and the circumstances of her arrest.

¶ 29    On April 23, 2019, the circuit court denied defendant's motion in a written order. The circuit court noted that evidence Beckom was released without charges following the cocaine arrest would have been cumulative because the jury already heard evidence that Beckom beat Ponquinette, was arrested, and the State would recommend probation on lesser charges in exchange for her testimony. Moreover, the cocaine arrest "pale[d] in comparison to the significance of avoiding greater consequences related to the murder." Accordingly, Hill's affidavit was immaterial, and defendant could not show a reasonable probability that the outcome of the trial would have been different if the evidence had been disclosed. On June 14, 2019, we allowed defendant's late notice of appeal.

¶ 30    On appeal, defendant argues that the circuit court erred in denying leave to file a successive postconviction petition where he established cause and prejudice for his claim that the State failed to disclose that it did not charge Beckom for the narcotics arrest because she had agreed to testify. Defendant contends that the evidence would have impeached Beckom, creating a reasonable probability that the disclosure of her arrest could have changed the outcome of his trial.

¶ 31    The Act provides a mechanism through which a criminal defendant may claim that a substantial violation of his constitutional rights occurred at trial. 725 ILCS 5/122-1 *et seq.* (West 2018); *People v. Edwards*, 2012 IL 111711, ¶ 21. The Act allows for a collateral attack on a final judgment, and is not a substitute for a direct appeal. *Edwards*, 2012 IL 111711, ¶ 21.

¶ 32    The Act contemplates the filing of only one postconviction petition. *Id.* ¶ 22. A defendant seeking to file a successive petition must obtain leave of court. 725 ILCS 5/122-1(f) (West 2018). To do so, the defendant must adequately allege facts demonstrating a *prima facie* showing of cause and prejudice. *People v. Bailey*, 2017 IL 121450, ¶ 24. Specifically, a defendant must demonstrate

that an objective factor impeded his ability to raise his claim during his initial postconviction proceedings, and the claim so infected his trial that his conviction or sentence violated due process. *People v. Lusby*, 2020 IL 124046, ¶ 27; see also 725 ILCS 5/122-1(f) (West 2018). Cause-and-prejudice is a higher standard than the frivolous or patently without merit standard applied at the first stage of proceedings under the Act. *People v. Smith*, 2014 IL 115946, ¶ 35. Leave to file a successive petition should be denied when review of the successive petition and documentation make clear that the claims fail as a matter of law or the petition and supporting documentation is insufficient to justify further proceedings. *Id.* We review *de novo* the denial of leave to file a successive petition. *Lusby*, 2020 IL 124046, ¶ 27.

¶ 33     Under *Brady*, the State violates an accused's constitutional right to due process when it fails to disclose evidence that is favorable to the accused and material to guilt or punishment. *Brady*, 373 U.S. at 87. To state a successful *Brady* claim, a defendant must show that (1) the undisclosed evidence is favorable to him because it is exculpatory or impeaching, (2) the State inadvertently or willfully suppressed the evidence, and (3) the defendant was prejudiced because the evidence is material to guilt or punishment. *People v. Beaman*, 229 Ill. 2d 56, 73-74 (2008).

¶ 34     The cause and prejudice test may parallel the second and third elements of a *Brady* claim. *Strickler v. Greene*, 527 U.S. 263, 282 (1999). Specifically, the State's suppression of relevant evidence may be the reason a defendant failed to bring the *Brady* claim earlier, and prejudice may exist where the suppressed evidence is material under *Brady*. *Banks v. Dretke*, 540 U.S. 668, 691 (2004).

¶ 35     Evidence is material if there is a reasonable probability that the result of the proceeding would have been different had it been disclosed. *Beaman*, 229 Ill. 2d at 74. To establish materiality,

the defendant must show that the evidence could reasonably put the case in such a different light as to undermine confidence in the verdict. *Id.* at 74. Materiality does not require showing by a preponderance of the evidence that disclosure would have resulted in acquittal, and is not a sufficiency of the evidence test. *People v. Coleman*, 183 Ill. 2d 366, 393 (1998). However, impeachment evidence may not be material if "the State's remaining evidence is strong enough to preserve confidence in the verdict." *People v. Roman*, 2016 IL App (1st) 141740, ¶ 18 (citing *Smith v. Cain*, 565 U.S. 73, 76 (2012)).

¶ 36    Here, we find that the circuit court did not err in denying defendant's motion for leave to file a successive petition because he did not establish cause and prejudice. Specifically, defendant has not established prejudice because he cannot show that Beckom's uncharged arrest is material.

¶ 37    Beckom testified that she had been arrested and charged with aggravated battery and unlawful restraint in juvenile court for beating Ponquinette, the charges were dismissed, and in exchange for her testimony, the charges would be reinstated in juvenile court and the State would recommend probation. She further acknowledged that she believed she would not be charged in connection with Ponquinette's murder and lied to the police about beating Ponquinette. Smith testified that Beckom laughed and bragged at school about the murder, which Beckom denied. The jury, therefore, already knew that Beckom benefited from testifying against defendant.

¶ 38    Further, Daniel and Wilson also testified that they were receiving favorable treatment by the State for their testimony, and Daniel testified that he was on probation for delivery of a look-alike substance and had a pending unlawful use of a weapon charge. While defendant submitted with an earlier postconviction petition an affidavit from Daniel averring that Daniel testified falsely, the jury heard evidence at trial that Daniel had told defense counsel his testimony was false

and Carpenter recanted his written statement, and the jury resolved any credibility concerns with Daniel, Wilson, Carpenter, and Beckom in favor of the prosecution. More evidence that Beckom had reason to testify for the State would therefore not place this case in an entirely different light. As we stated in *People v. Douglas*, 2011 IL App (1st) 093188, ¶ 47, "a court of review will not upset a verdict by a jury on the possibility, not probability, that with a little bit more impeachment, the witness would have been found totally incredible."

¶ 39    In *Douglas*, the defendant was convicted of first degree murder after two eyewitnesses, David Butler and Thomas Brewer, testified that the defendant shot the victim. *Id.* ¶¶ 3-5. The defendant filed a postconviction petition claiming that trial counsel was ineffective because he did not call a witness who averred that Brewer stated that he did not actually see the defendant shoot the victim. *Id.* ¶¶ 12, 14. On appeal from the summary dismissal of the petition, we found that the defendant could not establish prejudice from counsel's performance because (1) Butler was also an eyewitness, and (2) Brewer was already impeached by other evidence that he had stated he did not see the defendant shoot the victim and allowed his children to stay with the defendant's mother after the shooting. *Id.* ¶¶ 46-48.

¶ 40    Here, as in *Douglas*, the proffered evidence would only have further impeached a witness who had already been impeached. Moreover, although the defendant in *Douglas* raised an ineffective assistance of counsel claim, the prejudice standard for ineffective assistance is rooted in the materiality standard for a *Brady* claim. See *People v. Moore*, 279 Ill. App. 3d 152, 160-61 (1996) ("The genesis of the standard for judging the prejudice necessary to elevate counsel's performance to a level of constitutional deprivation parroted the standard for judging materiality of undisclosed evidence favorable to an accused.").

¶ 41    Defendant argues that in *Douglas*, the impeaching evidence addressed a fact already before the jury, namely, that the eyewitness made a prior inconsistent statement regarding whether he saw the shooting. However, the jury here already heard evidence that Beckom was receiving favorable treatment from the State in exchange for her testimony, the same kind of evidence in Hill's affidavit. Consequently, we do not believe the jury would find Beckom completely incredible if it knew Beckom further benefited for her testimony.

¶ 42    Defendant also alleges that Beckom's arrest involved narcotics, and is therefore impeaching independent of Beckom's relationship with the State because "habitual users of narcotics become notorious liars" whose testimony "is subject to suspicion." (Internal quotation marks omitted.) *People v. Herman*, 407 Ill. App. 3d 688, 705 (2011). However, defendant provides no evidence to show that Beckom was a habitual drug user, and Hill only averred that Beckom was arrested once. Accordingly, that the arrest involved narcotics does not persuade us that the jury would find Beckom incredible. Further, to the extent defendant argues that the arrest shows that Beckom's involvement in the beating of Ponquinette was not an "isolated incident" of criminal activity, it is unlikely that would persuade the jury where Beckom testified that she informally led the gang's female branch.

¶ 43    Moreover, even accepting that the jury would have found Beckom completely incredible, there is not a reasonable probability that the jury would have reached a different verdict. While defendant correctly notes that materiality is not a sufficiency of the evidence test, impeachment evidence may be immaterial if "the State's remaining evidence is strong enough to preserve confidence in the verdict." *Roman*, 2016 IL App (1st) 141740, ¶ 18 (citing *Smith*, 565 U.S. at 76).

¶ 44    The State's remaining evidence achieves that end. Daniel's and Wilson's testimonies established that Ponquinette was beaten in defendant's garage, then at the playground. Carpenter's written statement provided that defendant was in the group that Mobley instructed to "Kill the b***." Daniel and Wilson left the playground, then passed Jackson on their way to the bridge, and Jackson stated he was getting a sewer cover. Defendant was on the bridge near Ponquinette, who was tied in the fetal position. Defendant stated that "[W]e hit the b*** in the head with bricks, and she still wouldn't die," and Lovett told Wilson to leave if she did not want "to see this." Wilson and Daniel left, and passed Jackson approaching the bridge with a sewer cover. Daniel and Wilson then saw defendant, Jackson, and Lovett near a bus stop. Defendant and Jackson were "excited," and Jackson mumbled that he "sunk the b***." Ponquinette's body was found in the channel with lacerations on her skull, and a sewer cover and a rock covered with blood spatter and hair that matched hers were found nearby.

¶ 45    Unlike Daniel and Wilson, Beckom did not testify that defendant was on the bridge with Ponquinette or state they had hit Ponquinette with bricks. Beckom's testimony was therefore much less incriminating than Daniel's and Wilson's testimonies, contrary to defendant's contention that Beckom was the State's "most important witness." Defendant notes that he testified that he was not present when Ponquinette was killed and did not state that he hit her in the head with bricks, and argues that the jury was therefore faced with a credibility contest. However, Hill's affidavit does not impeach Daniel or Wilson, whom the jury apparently found credible. Thus, evidence of Beckom's arrest does not undermine confidence in the verdict, and is not material.

¶ 46    Because defendant cannot show that the evidence was material, he cannot bring a successful *Brady* claim. *Beaman*, 229 Ill. 2d at 73-74. Accordingly, he cannot show that he was

prejudiced by the State allegedly withholding evidence of Beckom's arrest, namely, that it "so infected the trial that the resulting conviction or sentence violated due process." 725 ILCS 5/122-(f) (West 2018). Therefore, the circuit court properly denied leave to file a successive postconviction petition.

¶ 47    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 48    Affirmed.