NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2019 IL App (4th) 170542-U

NO. 4-17-0542

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| WILLIAM L. AYRES, | ) | No. 17CF192 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Roger B. Webber, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Turner and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant was denied due process when the jury was informed it could find
defendant guilty of unlawful possession of a weapon based on conduct for which
he was not charged.

¶ 2        In June 2017, defendant, William L. Ayres, was convicted of unlawful possession

of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2016)) and sentenced to 10 years'

imprisonment. Defendant appealed his conviction, arguing (1) he was denied due process when

the State charged him with possessing a firearm in Urbana, Illinois, but informed the jury he

could be found guilty of the charged offense based on evidence showing he constructively

possessed a firearm in Rantoul, Illinois, conduct for which he was not charged; (2) defendant

was denied the effective assistance of counsel when his trial counsel failed to adequately cross-

examine the State's expert on gunshot residue; and (3) the trial court erred by excluding defense

witness, Juanita Turner, as a discovery sanction. We agree with defendant's first contention of error and reverse and remand for a new trial.

¶ 3                                      I. BACKGROUND

¶ 4          On February 13, 2017, defendant was charged by information with unlawful possession of a firearm by a felon (720 ILCS 5/24-1.1(a) (West 2016)). According to the information, the State alleged defendant, "on February 10, 2017, in Champaign County," committed the offense when he "knowingly possessed a firearm[.]"

¶ 5          On March 3, 2017, a preliminary hearing was held on the charge. At the hearing, the State called Robert Derouchie, a deputy with the Champaign County Sheriff's Office, to testify. According to Deputy Derouchie, officers were dispatched to 304 Scottswood Drive in Urbana, Illinois, in response to a shots-fired call. Deputy Derouchie, who reviewed officers' reports of defendant's arrest, testified Tino Kelly, Kendrick Long, and Brandaune Tillman were at the above address to retrieve Tillman's daughter and some personal belongings. When they approached the front door, defendant was standing in the doorway. Defendant pulled a silver handgun from his pocket. Kelly, Long, and Tillman fled. Defendant followed. Long reported hearing a shot fired. Officers recovered a shell casing.

¶ 6          At the close of the hearing, the trial court found the State met its burden for preliminary-hearing purposes. The court observed if the evidence were believed, it would establish "the felony offense as charged was committed and *** defendant is the person who committed it." The trial court entered a written order finding "probable cause" to believe defendant committed the felony offense charged in the information.

¶ 7          Defendant's jury trial was conducted in June 2017. Because defendant is not

challenging the sufficiency of the evidence on appeal, we need not provide a detailed summary of the trial.

¶ 8          The State's first witness was Brandaune Tillman. Tillman testified Robin Smith is the mother of his four children. He had known Smith for approximately four years. Smith resided at 304 Scottswood Drive. Tillman, on the evening of February 10, 2017, went to Smith's home to retrieve some items and see his children. It was dark outside, but the porch light was on. Accompanying Tillman was his brother, Tino Kelly, and his cousin, Kendrick Long. Tillman knocked on Smith's door. Smith and defendant answered. Defendant pointed a handgun at Tillman. Tillman fled. While running, Tillman heard a gunshot. Tillman estimated the gunshot occurred less than a few minutes after he started running. According to Tillman, he returned to the scene after the police arrived.

¶ 9          On cross-examination, Tillman testified he had been in a relationship with Smith for three years. The relationship ended after February 10, 2017. As of that day, Tillman resided with Smith. Earlier that afternoon, Tillman and Smith argued over Smith's relationship with defendant. When Tillman went to the residence, he knew defendant was there.

¶ 10          Mary Wong, a forensic scientist employed with the Illinois State Police, Division of Forensic Services, testified she employed gunshot-residue analysis in the case. Based on the analysis of defendant's gunshot-residue kit, Wong opined defendant "either discharged a firearm, was in the vicinity of a discharged firearm or came into contact with a primer gunshot residue related area." Wong testified gunshot residue is fragile and easily disturbed. On cross-examination, Wong agreed gunshot residue "can spread out." She agreed it would be possible for gunshot residue to be on a person "in the environment of a discharged firearm."

¶ 11        At the start of the third day of trial, defense counsel informed the court of an additional witness: Juanita Turner. Defense counsel reported defendant, during Wong's testimony, was made aware that he was with Turner, his cousin, on February 10, 2017, and she had fired a firearm that afternoon in Rantoul, Illinois. Counsel reported Turner possessed a Firearm Owner's Identification (FOID) card and owned a firearm. Upon hearing this information, defense counsel contacted Turner, who corroborated defendant's statements. Defense counsel informed the State of this new information the previous night. Defense counsel requested to be allowed to call her as a witness.

¶ 12        The State confirmed it learned of the witness the night before by email. The State expressed it had already released Wong from her subpoena and Wong was unavailable that afternoon to testify in response to Turner's testimony. The State indicated Wong was available the following morning, "but the jurors have not been asked about whether they'd be available tomorrow morning." The State suggested the appropriate sanction would be to bar Turner's testimony because it was not disclosed properly.

¶ 13        The trial court stated the following after confirming Smith would be defendant's first witness:

> "What I'd like to do is get [Smith's] testimony on, see how
> long that takes. Probably take a recess and give you an opportunity
> to interview the potential witness. And then I, I would make a
> decision about—barring testimony is, is the most extreme sanction
> we can do. I'm a little reluctant to do that. I, I agree it's not an
> ineffective[-]assistance[-]of[-]counsel claim, at least not obviously.

- 4 -

"*** If we need to extend the case into tomorrow for you to get your rebuttal witness here, we could probably do that. It may or may not create a problem with the jurors."

¶ 14    Defendant called Smith to testify. According to Smith, Tillman fathered her last three children. Their relationship officially ended on February 10, 2017, after a verbal argument over Smith's relationship with defendant. Tillman was removed from the home that afternoon.

¶ 15    Smith testified defendant arrived at her home around 5 p.m. They were "hanging out and having fun." At some point, Smith received a text message from Tillman. Smith anticipated Tillman was coming to her home. Later that evening, Smith observed Tillman, Kelly, and Long "coming around [her] bay window." They "bang[ed]" on her windows and door. Smith opened the front door to see what was going on. She did not recall whether defendant approached the door with her. Tillman then pulled Smith through the grass. Tillman "winded up going, going down the street" and Smith "took his car down the street to him." Smith tried to exit the car, but Tillman pulled her back into it. Smith was able to get out of the car. At this point, the police began to arrive. Smith did not hear a gunshot that day. She did not see defendant with a gun that day. Smith testified, in the recorded phone conversation, defendant was telling her to get rid of ecstasy, not a weapon.

¶ 16    The trial court revisited the matter of Turner's testimony. Given the State's concerns about the late disclosure of Turner as a witness, the trial court concluded an offer of proof would be appropriate. During this offer of proof, Turner testified she and defendant, on February 10, 2017, drove out to a field near Rantoul around 1:30 p.m. Turner had owned a handgun for three years and had never fired it. Turner pulled out the gun and began to hold it.

Defendant told her, "no, cuz, you hold it like this." At that point, defendant grabbed Turner's wrist "and put it out." Turner then "squeezed the trigger." She did not intend to. Turner said defendant did not touch or hold the handgun. Turner further testified she asked defendant around mid-March to have his lawyer contact her. Turner testified defendant "said he was waiting for her to contact him."

¶ 17 The trial court granted the State's motion to exclude Turner's testimony. The court concluded defendant had discussions with Turner as early as March 20, 2017, and the witness advised him to have his attorney contact her.

¶ 18 Defendant testified on his behalf. According to defendant, his last address was in Rantoul, where he resided with Turner. He and Smith began their romantic relationship on February 10, 2017. On that date, defendant and Turner went out to a field and Turner test-fired her gun. Defendant denied holding the gun, but testified he held her wrist and "I guess she shot it." Around 1 or 1:30 p.m., Turner drove defendant to Urbana to Smith's house. They hung out at the house. Later that evening, around 6 or 7 p.m., Tillman, Long, and Kelly arrived at the house. At that time, defendant "was coming out already to smoke a cigarette." The door was already halfway open. Defendant heard someone beating on the window. It was Tillman, who acted like he wanted to fight defendant. Defendant saw either Kelly or Long reach for his waistband. Defendant "swung and ran." Defendant did not see a gun, but he heard a gunshot. Defendant ran approximately four blocks before turning a corner and heading back to Smith's house. He ran in through the back door.

¶ 19 During the discussion on jury instructions, the trial court noted an instruction had been submitted on constructive possession: "And 20 is IPI 4.16, construct—possession may be

- 6 -

actual or constructive." The State asked to be "heard on that," but defense counsel indicated she was not objecting.

¶ 20        In closing argument, the State informed the jury defendant could be convicted of unlawful possession of a weapon by a felon based on his constructive possession of Turner's handgun:

> "Finally, we have another claim by the defendant this morning, [more bizarre] than most of the rest, and that was that that afternoon he was firing a weapon with his cousin. That's why he has the [gunshot residue] on his hand. That's why he has got that gunshot residue on his hand.
>
> Now what did Ms. Wong tell you? She said that gunshot residue is fragile. This [gunshot residue] apparently was on his hands from about 1:30 that afternoon and remained there until after midnight, according to the defendant.
>
> In your everyday experience in life, do you go nine or ten hours without washing your hands, because apparently the defendant does. Well, it's not clear whether he does. ***
>
> What did the defendant tell the police? The defendant told the police there was absolutely no reason there would be gunshot residue on his hands. At that point, he didn't know the lab results would be coming back. He didn't know what would be found on his hands. At that point, he was trying to preserve every avenue of

innocence or claimed innocence available to him. And, at that point, he said there would be no gunshot residue on his hands. That was before he heard Ms. Wong testify yesterday and conveniently remembered his shooting range experience with his cousin.

Even if you are inclined to believe the defendant's story here today, the defendant is guilty of unlawful possession of a weapon by a felon. He's not charged with possessing a weapon on Scottswood Drive. He's charged with possessing a weapon. And, under the defendant's account, when he reaches around his cousin and he grabs her wrist and he controls the direction of that gun, he is guilty of unlawful possession of a weapon by a felon."

¶ 21    The jury found defendant guilty. The trial court sentenced him to ten years in prison. This appeal followed.

¶ 22                                    II. ANALYSIS

¶ 23    On appeal, defendant's first argument is that he was denied his constitutional right to due process when the State argued he could be convicted of an uncharged firearm-possession offense and the trial court instructed the jury on constructive possession based on that uncharged conduct. In support, defendant relies upon the language in *People v. Kolton*, 219 Ill. 2d 353, 359, 848 N.E.2d 950, 954 (2006): "[A] defendant may not be convicted of an offense he has not been charged with committing." Defendant acknowledges he did not object at trial but maintains this court may provide him relief under the plain-error doctrine.

¶ 24    In response, the State contends defendant was not denied due process, as he was

provided sufficient notice in the information. Specifically, the State argues the charging instrument complied with the law in that it sets forth "the date and county of the offense as definitely as can be done" (725 ILCS 5/111-3(a)(4) (West 2016)). The State argues the charging instrument informed defendant he was accused of possessing a handgun on February 10, 2017, in Champaign County. The conduct in Rantoul, according to the State, falls within the charge. The State further emphasizes defendant provides no authority to show a charging instrument is limited by the evidence offered by the prosecution at a preliminary hearing or in its case-in-chief.

¶ 25        Defendant disputes the State's contention he was charged for his conduct in Rantoul, Illinois. Defendant cites statutory law that requires felony prosecutions be commenced "by information or indictment." 725 ILCS 5/111-2(a) (West 2016). Defendant emphasizes prosecutions by information, like the prosecution of defendant, are permissible after "a preliminary hearing has been held" and the trial court finds "probable cause to believe the defendant committed an offense ***." *Id.* Defendant emphasizes, in this case, the preliminary hearing only involved the Urbana incident and he was only provided notice of that charge.

¶ 26        As defendant acknowledges, he failed to raise this argument before the trial court, thereby forfeiting it. See *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675 (failure to preserve a purported error by not objecting at trial or raising the error in a posttrial motion results in forfeiture). Errors that have been forfeited may, however, be considered for the first time on appeal under the plain-error rule "if (1) the evidence was closely balanced or (2) the error was sufficiently grave that it deprived the defendant of a fair sentencing hearing." (Internal quotation marks omitted.) *People v. Hanson*, 2014 IL App (4th) 130330, ¶ 26, 25 N.E.3d 1. The first task in employing plain-error analysis is to consider whether a clear or obvious error occurred. *People*

*v. Thompson*, 238 Ill. 2d 598, 613, 939 N.E.2d 403, 413 (2010). We begin with that analysis.

¶ 27        Under the federal and Illinois constitutions, defendants in criminal prosecutions have a fundamental due-process right to notice of the charges against them. *People v. DiLorenzo*, 169 Ill. 2d 318, 321, 662 N.E.2d 412, 413 (1996); see also *People v. Clark*, 2016 IL 118845, ¶ 30, 50 N.E.3d 1120. Because of this right, a criminal defendant may not be convicted of a crime he has not been charged with committing. *Id.*

¶ 28        Here, the State maintains the charging instrument provides sufficient notice of charges to satisfy due process for not only the Urbana incident but also the Rantoul incident. We are not persuaded. In Illinois, prosecutions for felonies may be commenced "by information or indictment." 725 ILCS 5/111-2(a) (West 2016). Such prosecutions may continue only after a "preliminary hearing" is held and after "probable cause to believe the defendant committed an offense was found ***." *Id.* In this case, the State, at the preliminary hearing, presented evidence regarding the alleged Urbana offense. Only one witness testified. Deputy Derouchie testified eyewitnesses reported defendant, around 9 p.m. on February 10, 2017, possessed a silver handgun in Urbana. The court found probable cause. By this process, defendant was provided notice of only the State's prosecution of him for the alleged Urbana incident. No notice was given regarding the Rantoul events.

¶ 29        Despite this lack of notice, the State told the jury it could convict defendant for the charge of unlawful possession of a weapon by a felon, based on the Urbana conduct, if the jury found defendant constructively possessed the weapon in Rantoul. The State thus sought a conviction on uncharged conduct for which defendant was provided no opportunity to prepare or present a defense. No preliminary hearing was held. No probable cause was found. Instead,

defendant was not informed until the close of testimony at his trial the State would seek a conviction based on either the Rantoul conduct or the alleged Urbana incident. Defendant was denied his right to due process.

¶ 30        Defendant further notes the Rantoul conduct did not arise from the same transaction or conduct as the Urbana offense, such that notice of the Urbana charge would be sufficient under section 5/111-2(f) (725 ILCS 5/111-2(f) (West 2016)). Subsection (f) authorizes, in felony prosecutions by information after a preliminary hearing, the prosecution for all offenses arising from the same transaction or conduct. *Id.* We agree with this contention. The allegations for both incidents involved different guns in different towns, separated by several hours.

¶ 31        It was, therefore, clear error for the State to allege defendant could be convicted of unlawful possession of a weapon based on the Rantoul conduct and for the trial court to inform the jury it could convict defendant of the offense based on "constructive possession."

¶ 32        Having found clear error, we turn to the question of whether that error amounts to plain error, permitting this court to forgive defendant's forfeiture. We turn to the questions of whether the evidence is so closely balanced the error alone threatened to tip the scales of justice against defendant or whether the error is so serious it affected the fairness of defendant's trial and challenged the integrity of judicial process. See *Clark*, 2016 IL 118845, ¶ 42. As defendant observes in his reply brief, the State's only response to his contention this court should consider the matter as plain error is that error did not occur. The State has forfeited any argument the evidence is not closely balanced or the error is not so serious it affected the fairness of defendant's trial and challenged the integrity of judicial process. Ill. S. Ct. R. 341(h)(7), (i) (eff. May 25, 2018) (showing points not argued in the appellee brief are forfeited).

¶ 33        Nevertheless, we find the second prong of the plain-error rule applies. In *Clark*, the Illinois Supreme Court concluded an error allowing the defendant to be convicted of an uncharged offense that was not a lesser-included offense of a charged offense affected the fairness of defendant's trial and challenged the integrity of the judicial process. *Clark*, 2016 IL 118845, ¶ 47. The court stressed the error violated the defendant's fundamental due-process right to notice of the charges against him and the "unauthorized conviction challenge[d] the integrity of the judicial process and should not stand." *Id.* Here, the error of informing the jury it could convict defendant of the charged offense of unlawful possession of a weapon by a felon in Urbana based on his uncharged conduct in Rantoul affected the fairness of defendant's trial and challenged the integrity of judicial process. Under these circumstances, defendant is entitled to new trial.

¶ 34        We note defendant makes no challenge to the sufficiency of the evidence on appeal. Given the testimony at trial, any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found defendant possessed a handgun. There is, therefore, no double-jeopardy impediment to a new trial. See *People v. Beaman*, 229 Ill. 2d 56, 82, 890 N.E.2d 500, 514 (2008).

¶ 35                            III. CONCLUSION

¶ 36        We reverse the trial court's judgment and remand for a retrial.

¶ 37        Reversed and remanded.