NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190501-U

NO. 4-19-0501

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 29, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | De Witt County |
| WILLIAM D. SPENCER, | ) | No. 15CF53 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Roger B. Webber, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Presiding Justice Steigmann and Justice Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, concluding defendant's petition for relief from judgment failed to allege sufficient facts to establish the possibility of a meritorious claim.

¶ 2    Defendant, William D. Spencer, appeals from the trial court's dismissal of his petition for relief from judgment under section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2018)). On appeal, defendant argues we should reverse and remand for further proceedings as his petition alleged sufficient facts to establish the possibility that it was timely filed and included a meritorious claim. We affirm.

¶ 3                             I. BACKGROUND

¶ 4                             A. Information

¶ 5        In August 2015, the State charged defendant by information with aggravated battery (720 ILCS 5/12-3.05(c) (West 2014)). The State alleged, on September 11, 2014, defendant "knowingly and without authority made physical contact of an insulting or provoking nature with Dustin Peterson [by using] his body to strike and move *** Peterson, knowing *** Peterson to be on public property[,] to wit: the De Witt County Courthouse."

¶ 6                                B. Jury Trial

¶ 7        In May 2016, the trial court conducted a jury trial. Prior to commencing the trial, the court heard argument on a motion to quash a subpoena for a reporter, Jerry Nowicki. Nowicki's attorney alleged Nowicki would testify only to the fact defendant winked at him prior to the incident between defendant and Peterson and the wink was in response to Nowicki nodding at defendant as a friendly acknowledgement. Nowicki's attorney argued, in part, the testimony was irrelevant as the gestures between defendant and Nowicki were not pre-arranged signals concerning the subsequent incident between defendant and Peterson. The State disagreed, asserting Nowicki's testimony was relevant as Nowicki was the only one who saw the wink and it was for the jury to decide defendant's intentions behind the gesture. The State specifically noted, "If there was somebody else that could testify to this, then I would call them to avoid this, but in the investigation, there was never anybody else that saw this that was interviewed." In response, Nowicki's attorney stated to the court: "I think that Mr. Nowicki did acknowledge to a deputy that he had winked, but I don't want you to be left with the impression that Nowicki like called the police officer and told him it happened. That isn't how the police officer learned about it." The State, in response, noted a "Detective Werts" indicated in a report "that [Nowicki] told me that [defendant] winked at him just moments before he struck Dustin." After considering the arguments

presented, the court denied the motion. In rendering its decision, the court noted "everyone agrees no one else saw the wink."

¶ 8 At trial, the evidence showed the following. On September 11, 2014, at 8 p.m., the De Witt County Board held a meeting in a De Witt County courtroom. Sheriff's Deputy Mack King provided security for the county board meeting. Deputy King was equipped with a body camera on the front of his jacket.

¶ 9 At the time, the De Witt County Board consisted of members of two opposing political factions. Sherrie Brown, the county board chairman and paramour of defendant, ran a coalition to preserve clean water and stop the dumping of hazardous waste at the Clinton landfill, which was located above the Mahomet Aquifer. The majority of the county board members were members of the coalition. Defendant, a non-board member, was both a member of the coalition as well as the WATCH Clinton Landfill group, a group dedicated to protecting the water in the county. Members of the Better Government for De Witt County organization opposed the actions of the coalition. Several county board members were members of that organization. Peterson, a non-board member, was also a member of the Better Government for De Witt County organization.

¶ 10 That evening, a vacancy on the county board existed, and members of the Better Government for De Witt County organization sought to approve one of their members, Christina Pruser, to fill the position. The issue caused a commotion at the meeting. At one point, Danny Ballenger, a county board member and member of the Better Government for De Witt County organization, called out to Peterson, who was seated in the audience. At approximately 8:40 p.m., Brown adjourned the meeting because members of the Better Government for De Witt County organization were being uncivil. Board members objected to the adjournment and directed

disparaging comments at Brown. Deputy King began to clear the courtroom. Members of the opposing political factions began to argue with each other. Due to the disparaging comments directed at Brown, defendant yelled, " 'Bullies and wife beaters.' " Defendant testified he was not angry when he made the comment. Defendant, who was seated in the back of the courtroom, stood up and began to walk down an aisle toward the front of the courtroom to collect recording equipment he brought to the meeting. The aisle was three feet wide.

¶ 11        At that time, Peterson was standing in the courtroom aisle, leaning up against the courtroom bench with his hands on his hips, and talking with Pruser and Andy Hedrick. Peterson testified, "[O]ut of my left corner of my eye, I saw [defendant] approaching, and at that point he lowered his shoulder and tried to knock me over." Peterson indicated he was struck in the "shoulder, left chest area," causing him to shuffle his feet and grab the bench in front of him. Peterson testified he did not try to block the aisle, stick his elbow into defendant's path, or strike defendant. He believed sufficient space existed behind him for a person to walk by without making contact. Peterson also stated neither before nor after the incident did he and defendant exchange comments with each other.

¶ 12        Pruser testified, while talking with Peterson after the county board meeting adjourned, she observed defendant "lower his shoulder and run into" Peterson, causing Peterson to lose his balance. She believed Peterson was struck on the right side of his body. Pruser disclosed what she observed to Deputy King on the night of the incident.

¶ 13        Hedrick testified, while talking with Peterson after the county board meeting adjourned, he observed defendant "coming down the [aisle] toward [Peterson], and when he got up there to him he lowered his shoulder like a football player and hit him in the back." Hedrick

believed the contact occurred intentionally. Hedrick testified he did not hear Peterson say anything to defendant. He acknowledged, however, he stated in a September 12, 2014, interview he heard Peterson say something to defendant. Hedrick testified if Peterson said something, it occurred after the contact. Hedrick was not a member of the Better Government for De Witt County organization.

¶ 14    Defendant testified, in approaching the front of the courtroom, he first passed Nowicki, a reporter, in the aisle, who smiled at him and then he smiled back. Defendant acknowledged he "might have winked" at Nowicki and asserted, if he did, it was as a friendly gesture. Nowicki testified he acknowledged defendant when defendant was passing with a nod of the head and a smile and then defendant "[s]miled and winked" at him as a form of acknowledgment. Nowicki testified he did not call the police and report the wink by defendant.

¶ 15    Defendant testified he passed by Nowicki without having to turn his body. After passing Nowicki, defendant observed Peterson staring at him. Peterson was standing in the middle of the aisle, with his elbows sticking out behind his back and his hands on his hips. When defendant was approximately a step away from Peterson, Peterson called him an "asshole." Defendant did not respond to Peterson's comment. Defendant turned his shoulder away from Peterson and toward the wall and continued forward, believing he had sufficient space to pass Peterson without making contact. Defendant asserted Peterson intentionally blocked his path by rotating his arm and turning into him. Defendant was unsure whether contact actually occurred. Defendant demonstrated for the jury the movements he made when passing by Peterson. After collecting his equipment in the front of the courtroom, defendant returned down the aisle and passed Peterson without making any contact. Defendant testified, prior to rendering his testimony, he reviewed a video recording of the incident approximately 20 times.

¶ 16    Karen Musick testified she watched defendant walk up the aisle after the county board meeting, and he never made contact with anyone, either intentionally or unintentionally.

¶ 17    Video footage from Deputy King's body camera was published to the jury. The video footage shows the incident between defendant and Peterson. The jury was also given still images taken from the video.

¶ 18    After the incident occurred, Deputy King finished clearing the courtroom. During that time, defendant collected his equipment and left to drive his friend home. Keith Koons testified defendant did not appear to be upset after the incident. Deputy King did not ask defendant to discuss the incident prior to him leaving the building.

¶ 19    Defendant later received a phone call from Deputy King, but he did not answer. Defendant testified he called a "criminal lawyer" and did not return Deputy King's phone call based on the legal advice he received. Deputy King acknowledged defendant had the right not to speak to the police.

¶ 20    Terry Hoffman, a member of the coalition, recalled incidents in the past where members of the Better Government for De Witt County organization would block the aisles during county board meetings.

¶ 21    Multiple witnesses testified defendant had a reputation for peacefulness. Defendant acknowledged the witnesses who rendered such testimony were his friends.

¶ 22    On the night of the incident, Peterson told Deputy King he did not desire charges to be pursued against defendant. Later, after reviewing video footage from the incident, Peterson requested charges be pursued as he was "shocked" and "wasn't sure why [the incident] happened." Peterson acknowledged after the incident he stated "he was not going to stoop to their level" and

"[h]e knows he's an idiot," referring to defendant. Peterson testified he did not engage in a conspiracy to stand by the aisle and block defendant to get him in trouble.

¶ 23    During Peterson's cross-examination, the State objected to a question about whether Peterson had been drinking alcohol prior to the meeting. A discussion then occurred on the record outside the presence of the jury. During the discussion, the State acknowledged Peterson had been charged with driving under the influence of alcohol (DUI), which it believed was still pending, but requested defense counsel be barred from asking any questions about the charge. Defense counsel asserted it would be proper for her to inquire about the charge if Peterson had been promised any favor in exchange for his testimony against defendant as it would show bias and motivation. The court allowed defense counsel to examine Peterson outside the presence of the jury as part of an offer of proof. During the offer, Peterson testified he was not promised any favor in exchange for his testimony against defendant. The court took judicial notice of the pending DUI case against Peterson and the fact it was being prosecuted by an independent special prosecutor. The court ruled defense counsel could not inquire about the pending DUI case given the lack of any expectation of favor and the fact the prosecution was completely unrelated. The court allowed defense counsel to question Peterson about whether he had been drinking alcohol prior to the meeting, to which Peterson testified he had not.

¶ 24    In closing argument, defendant presented a theory of defense suggesting Peterson was acting in concert with other, like-minded politicians to retaliate against him for his political speech and political acts. The State, in its argument, commented on the alleged wink defendant gave to Nowicki: "What is the wink for? I'll let you determine that. To me, the wink would be, you know, 'watch this', 'watch what's coming', and virtually moments after that, it did happen."

In response, defendant argued the jury should focus on the testimony presented when considering the alleged wink. Specifically, defendant argued both his and Nowicki's testimony indicated any wink was simply a form of friendly acknowledgment. Defendant further suggested the wink was "something of a red herring, some kind of weird evidence that's brought in to try to take your focus away from what really happened."

¶ 25   Following deliberations, the jury found defendant guilty of aggravated battery.

¶ 26         C. Posttrial Motion and Sentencing

¶ 27   In June 2016, defendant filed a posttrial motion and a memorandum of law in support of the motion. Following a July 2016 hearing, the trial court denied defendant's motion and then sentenced him to 12 months' probation.

¶ 28           D. Appeal

¶ 29   Defendant appealed *pro se*, seeking reversal of his conviction or a new trial based on various claims of error. We affirmed, concluding defendant's claims of error were either forfeited or meritless. See *People v. Spencer*, 2017 IL App (4th) 160569-U. Defendant, through retained counsel, filed a petition for rehearing, which we denied, and then a petition for leave to appeal. In January 2018, the supreme court denied defendant's petition for leave to appeal.

¶ 30         E. Section 2-1401 Petition

¶ 31   In March 2019, defendant, through retained counsel, filed a petition for relief from judgment under section 2-1401 of the Code (735 ILCS 5/2-1401 (West 2018)). Defendant sought relief from the judgment of conviction based on a claim suggesting the State failed to provide him with material evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Defendant alleged, in part, the State failed to provide him with evidence suggesting (1) Peterson "had been negotiating

a plea deal for his pending DUI case prior to Peterson testifying at [his] trial," (2) Peterson was pressured by the State to cooperate and testify, and (3) "an unidentified informant told the prosecution about [defendant] allegedly 'winking' at [Nowicki]." Defendant alleged the evidence relating to Peterson was material as Peterson played a "critical role" in the State's case and the evidence tended to show his bias, motive, or prejudice. Defendant alleged the evidence relating to the unidentified informant was material as a "critical issue" at trial was whether he winked at Nowicki before the incident. Attached to defendant's petition was, among other things, a copy of a report prepared by a "Detective Warts." In the report, the detective states, when speaking with Nowicki via telephone, "I told [Nowicki] that Sheriff Shofner received information that [defendant] made a gesture to [Nowicki] shortly before he ran into Dustin Peterson. [Nowicki] told me [defendant] winked at him just moments before he struck Dustin."

¶ 32   With respect to the petition's timeliness, defendant alleged, despite the fact the petition was filed more than two years after the judgment was entered against him, the statutory limitations period had not expired as the ground for relief had been fraudulently concealed by the State and he had made a good-faith effort in trying to uncover the ground for relief. Specifically, defendant alleged the following as it related to the State's alleged concealment:

"Here, the State violated its affirmative duty under *Brady* to produce material, favorable evidence under its control, thereby fraudulently concealing the information. Under *Brady*, the State has an affirmative duty to find and produce evidence in their control that may be material and favorable to the Defendant's case. [Citation.] The State had an ongoing duty under *Brady* to find and produce the

evidence regarding: the key witness's ongoing prosecution and correspondence between the De Witt County Sheriff's and State's Attorney's office and the State Appellate Prosecutor, the State affirmatively denied Petitioner access to the evidence. [Citations.] It is unlikely that the failure to disclose was an unintentional mistake, not only because the special prosecutor in this case was the recipient of one of the undisclosed e-mails but also, because officials in De Witt County and the special prosecutors were working closely together to investigate and prosecute the Petitioner. When the prosecution opted not to give Petitioner access to evidence in the government's control, it committed an affirmative act to conceal it."

With respect to his good-faith effort in trying to uncover the ground for relief, defendant alleged the following:

"Furthermore, the Petitioner demonstrated a good faith effort to uncover the evidence by making several attempts throughout his trial to uncover information through traditional methods of discovery. [Citation.] Petitioner expected all material evidence would have been turned over by the State at trial and did not continue to seek disclosures outside of discovery. Nevertheless, as a last ditch effort, Petitioner began his search for exonerative information from other sources soon after the court's denial of his direct appeal. Therefore, Petitioner was diligent in his attempts to

uncover the grounds for relief that were fraudulently concealed by the State for over two years.

Petitioner discovered the undisclosed *Brady* material between June and July of 2018."

¶ 33                           F. Motion to Dismiss and Response

¶ 34        In June 2019, the State filed a motion to dismiss defendant's section 2-1401 petition, and defendant filed a response to the State's motion to dismiss. In the motion to dismiss, the State argued defendant's petition failed to allege sufficient facts to establish the possibility that the petition was timely filed or included a meritorious claim. Specifically, the State argued the petition failed to sufficiently allege the ground for relief was fraudulently concealed or the undisclosed evidence was material to defendant's guilt.

¶ 35                                       G. Dismissal

¶ 36        Following a July 2019 hearing, the trial court dismissed defendant's section 2-1401 petition.

¶ 37        This appeal followed.

¶ 38                                       II. ANALYSIS

¶ 39        On appeal, defendant argues we should reverse and remand for further proceedings as his section 2-1401 petition alleged sufficient facts to establish the possibility it was timely filed and included a meritorious claim. The State disagrees.

¶ 40        Section 2-1401 of the Code (735 ILCS 5/2-1401 (West 2018)) provides "a comprehensive statutory procedure authorizing a trial court to vacate or modify a final order or judgment older than 30 days." *People v. Abdullah*, 2019 IL 123492, ¶ 13. A petition for relief from

judgment pursuant to section 2-1401 must "affirmatively set forth specific factual allegations supporting each of the following elements: (1) the existence of a meritorious defense or claim; (2) due diligence in presenting this defense or claim to the circuit court in the original action; and (3) due diligence in filing the section 2-1401 petition for relief." *Smith v. Airoom, Inc.*, 114 Ill. 2d 209, 220-21, 499 N.E.2d 1381, 1386 (1986).

¶ 41    Defendant's section 2-1401 petition sought relief from the judgment of conviction based on a claim suggesting the State failed to provide him with material evidence in violation of *Brady*. On appeal, defendant maintains his petition alleged sufficient facts to establish the possibility of a meritorious *Brady* violation due to the State's failure to provide him with the evidence relating to Peterson and the unidentified "wink" informant. This court reviews a dismissal of a section 2-1401 petition for failure to state a claim for relief *de novo*. *People v. McChriston*, 2014 IL 115310, ¶ 6, 4 N.E.3d 29. "*De novo* consideration means that we perform the same analysis that a trial judge would perform." *People v. Miles*, 2017 IL App (1st) 132719, ¶ 19, 86 N.E.3d 1210.

¶ 42    To establish a *Brady* violation, a defendant must demonstrate: "(1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either willfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." *People v. Beaman*, 229 Ill. 2d 56, 73-74, 890 N.E.2d 500, 510 (2008). With respect to the third element, "[e]vidence is material if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed." *Id.* at 74. "To establish materiality, an accused must show ' "the favorable evidence could reasonably be taken to put the whole case in such a different light as to

undermine confidence in the verdict." ' " *Id*. (quoting People *v. Coleman,* 183 Ill. 2d 366, 393, 701 N.E.2d 1063, 1077 (1998), quoting *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S. Ct. 1555, 1566 (1995)). In considering materiality, "courts must consider the cumulative effect of all the suppressed evidence rather than considering each item of evidence individually." *Id.*

¶ 43 First, with respect to the evidence relating to the unidentified "wink" informant, defendant alleged in his section 2-1401 petition the evidence was material as a "critical issue" at trial was whether he winked at Nowicki before the incident. We disagree. Defendant acknowledged before the jury he might have winked at Nowicki when he was passing him. The only issue in dispute was defendant's intentions for the possible wink, an issue thoroughly addressed by defendant in his closing argument. On appeal, defendant alleges the evidence relating to the unidentified informant was material as it suggested "the origin" of the wink allegation— "that it was made up by the police and fed to Mr. Nowicki." Defendant's allegation, however, is absent from defendant's petition and will not be entertained for the first time on appeal.

¶ 44 Second, with respect to the evidence relating to Peterson, defendant alleged in his section 2-1401 petition the evidence was material as Peterson played a "critical role" in the State's case and the evidence tended to show his bias, motive, or prejudice. We disagree. Even if the jury was given the additional evidence tending to show bias, motive, or prejudice and then wholly discounted Peterson's testimony based on that evidence, the jury still had before it video footage depicting defendant making sufficient physical contact with Peterson's body to upset Peterson's balance and eyewitness testimony from two witnesses—one of which was not affiliated with the same political faction as Peterson—about how defendant struck Peterson.

¶ 45 We find defendant's section 2-1401 fails to allege sufficient facts to establish the possibility of a meritorious claim where the evidence allegedly withheld from defendant was immaterial to his guilt. On this ground alone, dismissal was warranted.

¶ 46                                III. CONCLUSION

¶ 47       We affirm the trial court's judgment.

¶ 48       Affirmed.