NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 170799-U

NO. 4-17-0799

IN THE APPELLATE COURT

FILED
August 7, 2020
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Piatt County |
| GREGORY J. HOUSER, | ) | No. 16CF45 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Karle E. Koritz, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices DeArmond and Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, concluding the trial court did not abuse its discretion
in denying defendant's request to present evidence of an alternative suspect at trial
where defendant failed to establish a sufficient link between the third party and the
crimes committed against the victim.

¶ 2    Following a July 2017 jury trial, defendant, Gregory J. Houser, was found guilty of

first degree murder and sentenced to 55 years' imprisonment for the unlawful killing of his

estranged wife, Sheryl Houser, inside the Houser residence on or about October 4, 1990. Defendant

appeals, arguing this court should reverse and remand for a new trial because the trial court

deprived him of his right to present a complete defense when it precluded him from presenting

evidence at trial showing another man had attacked and sexually assaulted a woman near the

Houser residence prior to Sheryl's death. We affirm.

¶ 3                                  I. BACKGROUND

¶ 4                                  A. Information

¶ 5        In September 2016, the State charged defendant by information with four counts of first degree murder (Ill. Rev. Stat. 1989, ch. 38, para. 9-1(a)(1), (2), (3)). The State alleged defendant, on or about October 4, 1990, sexually assaulted and strangled Sheryl to death.

¶ 6                                B. Motion *in Limine*

¶ 7        Prior to trial, defendant filed a motion *in limine* seeking to present evidence of an alternative suspect at trial. Defendant alleged a man who had attacked and sexually assaulted a woman near the Houser residence prior to Sheryl's death may have committed the alleged crimes against Sheryl given the similarities in the crimes committed. The State objected, contending any similarities in the crimes committed were insufficient to link them together to suggest a common perpetrator.

¶ 8        The following factual basis was presented to the trial court concerning the crimes committed in the prior case. During the early afternoon of July 18, 1989, an 18-year-old Caucasian woman who had brown hair and blue eyes, stood at 5'8'', and weighed 130 pounds, was outside jogging alone near the Houser residence, which was in a rural, low-crime area. A man appeared from behind the woman and began running alongside her. The man started a casual conversation with the woman. The woman recalled the man stating, "I'm not from around here. I'm from Chicago." Suddenly, the man grabbed the woman from behind and placed her in a choke hold, causing her to lose consciousness. When the woman woke, the man was gone. Further investigation revealed she had been the victim of a sexual assault. The sexual assault occurred 1.82 miles from the Houser residence "as a crow flies" or 2.4 miles from the Houser residence traveling by road. The man's semen was found on the woman.

¶ 9        The following factual basis was presented to the trial court concerning the crimes committed in the instant case. During the evening of October 4, 1990, Sheryl, a 29-year-old

Caucasian woman who had brown hair and blue eyes, stood at 5'6'', and weighed 120 pounds, was at home with her three young children. Early the next morning, Sheryl was found dead in the garage in what appeared to be a suicide. Upon further investigation, the evidence indicated the scene was staged and Sheryl had been sexually assaulted and strangled to death by someone's hands. A used condom was discovered at the scene. Blood from an unidentified male source was discovered on Sheryl's nightgown. The deoxyribonucleic acid (DNA) from the blood did not match the DNA from the semen found in the prior case.

¶ 10       Defendant argued the crimes committed in the prior case and the alleged crimes committed in the instant case were substantially similar to warrant the introduction of evidence of the prior case to suggest the perpetrator in that case may have committed the alleged crimes in the instant case. Specifically, defendant highlighted both cases involved victims of similar appearance being choked and sexually assaulted by a man in the same rural, low-crime area within a relatively short period of time. Defendant further asserted the perpetrator in both cases acted recklessly given the crimes occurred either during the day on a public way or at night when others were nearby.

¶ 11       The State argued the crimes committed in the prior case and the instant case were not substantially similar to warrant the introduction of evidence of the prior case to suggest the perpetrator in that case may have committed the alleged crimes in the instant case. The State highlighted, unlike the instant case where the perpetrator attempted to disguise himself by using a condom and staging the scene to look like a suicide, the perpetrator in the prior case did not make any attempts to conceal himself. The State further highlighted, unlike the instant case where the perpetrator strangled the victim by hand and used a condom, the perpetrator in the prior case subdued the victim by chokehold and did not use a condom. Finally, the State highlighted, unlike the instant case where the perpetrator acted at night when others were around, the perpetrator in

the prior case acted during the day when nobody was around.

¶ 12    After considering the factual bases concerning the crimes committed in both cases, as well as the arguments presented, the trial court denied defendant's motion *in limine*, finding any similarities in the crimes committed were insufficient to link them together to suggest a common perpetrator.

¶ 13                              C. Jury Trial

¶ 14    In a July 2017, the trial court conducted an eight-day jury trial. The following is gleaned from the evidence presented.

¶ 15    In 1983, defendant and Sheryl married. In 1990, the couple and their three young children lived in a home in a rural area on the border of Champaign and Piatt Counties. Sheryl worked as a nurse, and defendant worked as a mechanic and volunteer firefighter.

¶ 16    In July 1990, defendant filed for a divorce from Sheryl. Sheryl, thereafter, filed an answer and a counterclaim seeking a divorce from defendant.

¶ 17    On August 8, 1990, police officers responded to the marital home. Defendant reported an argument occurred between him and Sheryl concerning Sheryl seeing someone. Defendant stated he did not hit Sheryl he "just grabbed her arms." Sheryl reported defendant accused her of seeing someone and then grabbed her arms, held her down on the floor, and told her he would keep her there all night if he had to. Officers observed bruising to Sheryl's arm in the location where she reported being grabbed. Defendant was arrested for battery.

¶ 18    On August 20, 1990, the trial court found grounds for the divorce had been established and ordered a child custody assessment.

¶ 19    On August 28, 1990, Sheryl filed for an emergency order of protection and gave testimony at a hearing. Given the emergency nature of the hearing, defendant was not given

- 4 -

advance notice of the hearing. Sheryl testified defendant forced her to have oral sex on threat of having the children taken away from her. Sheryl further testified the incident occurred while the children were present in the home. Based on the testimony presented, the trial court ordered defendant to refrain from harassing, interfering with the personal liberty, and intimidating or physically abusing Sheryl or any other family or household member.

¶ 20        On September 12, 1990, the trial court, with the agreement of the parties, entered a temporary custody order providing the children were to remain in the marital home and defendant and Sheryl were to alternate 3.5 days per week in the home. The case was then set for a hearing on permanent matters on October 29, 1990.

¶ 21        At some point when defendant and Sheryl were alternating occupancy of the marital home, defendant, with the assistance of two friends, spied on Sheryl from a cornfield when she was in the marital home at night. The men did so because defendant believed Sheryl was seeing someone.

¶ 22        On September 20, 1990, Sheryl received a phone call from defendant asking her to come to the marital home because of a sick child. Sheryl provided the following account at a later hearing as to what occurred after she went to the marital home that evening. After checking on the children, Sheryl had a conversation with defendant where he asked her to "come back to him." After she indicated the relationship was over and began to leave, defendant grabbed her, dragged her into a bedroom, pushed her onto a bed, restrained her with a nylon rope he used for hunting, and gagged her. Defendant specifically restrained Sheryl with the rope by wrapping it around her wrist, neck, and face. Defendant put his hand in Sheryl's vagina and his penis in her face, ordering her to "suck on it real hard or [she] would be in real trouble." When defendant eventually let Sheryl up, he ordered her to write on a piece of paper she consented to have sex with him. Sheryl attempted

to escape, at which time defendant grabbed her, pulled her back into the house, bent her over a couch, and attempted to get her to sign a blank piece of paper. Sheryl was eventually able to free herself and ran to the neighbor's house.

¶ 23    The neighbors allowed Sheryl inside their home and noticed abrasions and swelling to her lips, scratches and swelling to her eyes, marks on her neck, and bruises on her wrist and legs. Sheryl stated to her neighbors that defendant had tried to rape and strangle her. Police were called. Sheryl was upset and crying, making it difficult for her to speak to the police officers. The officers observed Sheryl's injuries, which they believed were consistent with Sheryl's account of what happened to her. The officers went to the marital home and spoke with defendant, who denied Sheryl's account. The officers observed what appeared to be blood and a pearl earring, separated from its clasp, in the master bed. The officers noted Sheryl was wearing the matching earring. Defendant was arrested and charged with aggravated criminal sexual assault and unlawful restraint.

¶ 24    During the week that followed the September 20, 1990, incident, Sheryl reported having been sexually assaulted by defendant to both her work supervisor and her best friend.

¶ 25    On September 24, 1990, Sheryl filed a petition for emergency relief based on the September 20, 1990, incident. At the hearing, Sheryl gave the testimony described above. The hearing resulted in Sheryl receiving temporary custody of the children and exclusive use of the marital home, and defendant receiving three hours of supervised visitation per week. After the September 20 incident, Sheryl's neighbor helped Sheryl change the locks to the marital home.

¶ 26    On October 3, 1990, Sheryl and her best friend had lunch together. Sheryl discussed upcoming events, including that she planned on attending a birthday party for her friend's son. Multiple witnesses opined Sheryl was not suicidal and testified to Sheryl's love for her children

and to her efforts to plan for the future, such as obtaining a credit card in her own name, setting out clothing for school picture day, and buying Halloween costumes for her children.

¶ 27         On October 4, 1990, Sheryl went to her parent's farm with the children. Later that evening, Sheryl returned to the marital home with the children. Sheryl's neighbors saw Sheryl getting the children out of the vehicle that evening. That same day, defendant attended a going-away party for a friend. Defendant's friend who was moving away did not recall testifying in a prior deposition that defendant was the first one to leave the going-away party. The individual hosting the going-away party recalled defendant was not at the party at the end of the night.

¶ 28         On October 5, 1990, a police officer who was patrolling through Mansfield noticed a vehicle driving slowly through the area around 1:40 a.m. The officer ran the license plates of the vehicle, which revealed the owner was one of the men who helped defendant spy on Sheryl. The officer observed another man in the passenger seat of the vehicle but could not identify the man.

¶ 29         Later that morning, Sheryl did not arrive for her scheduled work shift. A coworker called the telephone number for the marital home, and one of the children answered. The child, who was six years old at the time, reported Sheryl was sleeping in the garage with a rope around her neck and would not wake up. 911 was called.

¶ 30         Bobby Henderson, a volunteer firefighter, received a page concerning the Houser residence and a possible medical emergency and then drove directly there. Upon his arrival, one of Sheryl's neighbors arrived. They both entered the home. The three children were inside and one of the children indicated Sheryl was in the garage. The men went to the garage, where they discovered Sheryl dead. Her body, which was covered by only a nightgown, was partially suspended in the air with a nylon rope wrapped around the neck. The rope was connected to a pipe in the rafters. Other firefighters, including defendant, arrived at the scene. After Henderson told

defendant not to enter the garage, defendant asked what was wrong with Sheryl. Henderson later told the police defendant broke down at the scene.

¶ 31 Gerald Pea, who was a crime scene investigator with the Illinois State Police at the time of Sheryl's death, responded to the martial home and documented and photographed what he observed. The home had no signs of forced entry. The nylon rope suspending Sheryl's body in the garage was wrapped around Sheryl's neck three times and knotted at the back of the neck. The clothing tag to Sheryl's nightgown was caught in the rope. Sheryl had blood and saliva on the left shoulder of her nightgown. She had apparent abrasions on her elbow and ankle, and her heels looked dirty. A used condom was found on the floor of a recreation room leading from the garage. Pea did not recall if the condom was dry or moist when he found it or if he had to move anything to find the condom. Pea did not recall if he told Steven Hankel, a criminal investigator assigned to the case, he found a dry, used condom under a garbage bag.

¶ 32 Steven Hankel, who was a criminal investigator with the Illinois State Police at the time of Sheryl's death, responded to the marital home and interviewed defendant. Defendant reported having gone to a going-away party the night before and then to his parents' house followed by his grandparents' house, where he spent the night. Defendant acknowledged that was the first time he spent the night at his grandparents' house since he married Sheryl. He reported staying awake talking with his grandparents until 10:30 p.m. The next morning, defendant returned to his parents' house to shower and then returned to his grandparents' house for breakfast. After breakfast, he drove his truck to the fire department to wash it. While at the fire department, he received a page to go to the marital home. Defendant reported he was unaware of the nature of the call. Defendant stated the last time he was in the garage was around September 23, 1990, and he had not had contact with Sheryl since September 24, 1990. Hankel, who recalled hearing about a

dried condom found underneath some garbage bags in a room near the garage, asked defendant when was the last time he and Sheryl had sex, to which defendant stated sometime in early August 1990. Defendant also indicated he and Sheryl used condoms as a means of birth control. Defendant reported his suspicion that Sheryl was having an affair with a man named Walter Rohr, had a drug problem, and suffered from depression. Defendant denied any involvement in Sheryl's death.

¶ 33 Bob Manint, who worked at the sheriff's office at the time of Sheryl's death, accompanied Sheryl's body to Springfield for an autopsy. When Sheryl's body was placed on the autopsy table, Manint did not notice anything on her nightgown. Fragments of a latex glove were discovered inside the rope around Sheryl's neck. Dr. Grant Johnson, who performed the autopsy, concluded Sheryl's main cause of death was compression of the neck. Dr. Johnson was unable to determine if Sheryl's death was caused by suicide or homicide.

¶ 34 On October 10, 1990, Phillip Sallee, an Illinois State Police forensic scientist, received the used condom from the Houser residence and then preserved it in the freezer division of the state police lab until he examined it on October 23, 1990. He noted the condom "was older, not recently used." He estimated the condom was "at least days old and not necessarily weeks old" but could not give a scientific opinion on the issue. Sallee discovered separated sperm, which was indicative of an older stain. Sallee examined oral, vaginal, and rectal swabs from Sheryl and did not detect the presence of semen. Sallee examined two wooden sticks used to collect fingernail scrapings from Sheryl and did not detect any debris on the sticks. Sallee examined the sheets from the September 20, 1990, incident and could not obtain genetic markers for comparison.

¶ 35 On or about October 18, 1990, Kevin Horath, an Illinois State Police forensic scientist, received various items from the crime scene for forensic testing. No hairs or fibers were found on the rope used against Sheryl. No fingerprints were found on the pipe in the garage or on

the fragments of rubber gloves discovered within the rope. The process of examining the glove fragments for fingerprints destroyed any DNA.

¶ 36     On January 23, 1991, a coroner's inquest found the cause of Sheryl's death to be undetermined. That same month, the State sought the opinion of a forensic reconstructionist, Rob Englert. Englert was qualified to testify at trial as an expert witness in the field of crime scene reconstruction and blood stain analysis.

¶ 37     Englert testified Sheryl's body had injuries indicative of a struggle prior to her death. Specifically, Englert noted abrasions to Sheryl's left elbow, hip, and foot. Englert testified the injuries indicated Sheryl's heart was pumping at the time they were inflicted. Englert also testified Sheryl's body had lividity and blanching which would not occur unless her body was laid somewhere prior to being suspended in the air. Englert testified the condition of Sheryl's body and her nightgown suggested she was dragged across a surface, such as a dirty garage floor. Specifically, Englert noted Sheryl's heels and nightgown were dirty and she had corn stalk adhered to the wet abrasions on her foot.

¶ 38     Englert testified Sheryl's body had injuries consistent with a homicide as opposed to a suicide. Specifically, Englert noted lateral ligature groves around the neck, petechial hemorrhaging, and the absence of bruising around the neck above the rope. Engler testified the marks and bruising under Sheryl's mandible were "typical of manual strangulation, which is from a hand." Englert also testified the manner in which the rope was used was consistent with a homicide as opposed to a suicide. Specifically, Englert noted the rope was tied around Sheryl's neck so tightly it caused blistering and the rope was tied from behind. Englert also noted the tag of Sheryl's nightgown was stuck in the rope and fragments of a latex glove were stuck in the rope.

¶ 39     Englert identified a red circular blood stain near the hem of Sheryl's nightgown,

which he asserted did not appear in any photographs taken of Sheryl's body while she was at the marital home. Englert opined the blood on the nightgown was from morgue contamination.

¶ 40    In May 1991, a jury acquitted defendant of the charges stemming from the September 20, 1990, incident.

¶ 41    In June 2001, Jennifer Aper, a forensic scientist with the Illinois State Police, began reexamining evidence in this case. Aper was qualified to testify as an expert in the field of forensic DNA analysis. Aper examined the condom found in the marital home for DNA and found both Sheryl and defendant were possible contributors to a DNA profile mixture. Aper examined the two wooden sticks used to collect fingernail scraping from Sheryl and found there was insufficient DNA to obtain a DNA profile. Aper examined the blood stains on Sheryl's nightgown and detected a major and minor male DNA profile that excluded defendant. The profile was then compared to members of the Houser family, individuals who responded to the crime scene, and individuals who attended the autopsy. When no match was found, Aper concluded the blood was either from an unidentified person who had contact with Sheryl or contamination from the morgue. Aper knew of two cases of morgue contamination.

¶ 42    Around 2011, Dr. Scott Denton, a forensic, anatomic, and clinical pathologist, examined Sheryl's death. Dr. Denton was qualified to testify at trial as an expert in the field of forensic pathology.

¶ 43    Dr. Denton testified Sheryl's body had "recent" injuries at the time of her death. Specifically, he noted abrasions on the hip, thigh, elbow, ankle, and foot. Dr. Denton opined the abrasion to the thigh was consistent with a rope scraping against it. He also testified the abrasion to the elbow could have been sustained in a sexual assault.

¶ 44    Dr. Denton testified Sheryl's body had injuries consistent with a homicide as

opposed to a suicide. Specifically, Dr. Denton noted lateral ligature groves around the neck, petechial hemorrhaging, and the absence of bruising around the neck above the rope. Dr. Denton testified Sheryl had bruising of the neck consistent with manual strangulation. Dr. Denton also testified the manner in which the rope was used was consistent with a homicide as opposed to a suicide. Specifically, he noted the rope was tied around Sheryl's neck so tightly it would have caused a person to lose consciousness within 15 seconds and the rope was tied from behind in a complex slipknot. Dr. Denon also noted the tag of Sheryl's nightgown and fragments of a latex glove were stuck in the rope. Dr. Denton found saliva stains on Sheryl's nightgown were inconsistent with the position in which her body was discovered.

¶ 45         Dr. Denton identified a red stain near the hem of Sheryl's nightgown, which he asserted did not appear in any photographs taken of Sheryl's body while she was at the marital home. He opined the stain was either contamination from the funeral director cot, the reusable velour transport carryall, or the autopsy cart. Dr. Denton acknowledged morgue contamination was rare but maintained it could not have come from Sheryl's killer as it was not present in the photographs taken from the marital home.

¶ 46         Sheryl's father testified defendant went deer hunting on his farmland. One of the children testified to hunting with defendant and seeing him suspend a deer in the garage with a rope and hooks. A former coworker of defendant testified, sometime in September 1990, he overheard a conversation where defendant, who was upset with Sheryl, stated if she "didn't straighten up that he would use the rope and do her like he did his deer." The coworker testified he took the comment "very seriously" but acknowledged he told a police officer in June 1991 that he thought defendant was joking when he made the comment.

¶ 47         The defense called Walter Rohr to testify. Rohr testified he and Sheryl were friends

and Sheryl would confide in him about troubles in her marriage to defendant. Rohr had been to the marital home approximately four times. During those occasions, defendant was also present. Sometime in July or August 1990, Rohr and Sheryl spent the day together and had sex. Rohr testified Sheryl fell upon his chest after they had sex and stated, "[I]f Greg knew about this he would kill me." Rohr explained to Sheryl they had made a mistake and it should not happen again. Rohr testified Sheryl appeared to understand it was a mistake. On October 4, 1990, Rohr fell asleep by 7:30 p.m. and then woke up the next morning at 5:30 a.m. When he woke up, his father was in the house. On October 9, 1990, Rohr was interviewed by the police. He did not disclose his prior sexual relation with Sheryl. On September 23, 2016, a police officer took a buccal swab from Rohr. Rohr did not disclose his prior sexual relation with Sheryl. The next day, Rohr called the police to schedule an interview. During the interview, he disclosed his sexual encounter with Sheryl and noted it was possible his DNA might be at the Houser residence.

¶ 48      The defense also called to testify a woman who went to school with defendant and who began dating him in 2000. The woman testified defendant had never been physically abusive to her.

¶ 49      In closing, the defense admitted the evidence showed Sheryl had been murdered but asserted the State did not prove defendant committed the murder. The defense further argued the State failed to prove Sheryl was sexually assaulted or that defendant committed the alleged sexual assault.

¶ 50      Following its deliberations, the jury found defendant committed the offense of first degree murder and that he the committed said offense during the commission of a sexual assault.

¶ 51                    D. Posttrial Proceedings

¶ 52      In August 2017, defendant filed a motion for a new trial, arguing, in part, the trial

court erred when it prevented him from presenting evidence showing another man had attacked and sexually assaulted a woman near the Houser residence prior to Sheryl's death. Following a hearing, the trial court denied defendant's motion and sentenced him to 55 years' imprisonment. Defendant filed a motion to reconsider his sentence, which the court later denied.

¶ 53       This appeal followed.

¶ 54                                    II. ANALYSIS

¶ 55       On appeal, defendant argues this court should reverse and remand for a new trial because the trial court deprived him of his right to present a complete defense when it prevented him from presenting evidence showing another man had attacked and sexually assaulted a woman near the marital residence prior to Sheryl's death. The State disagrees, maintaining the trial court properly denied the introduction of any such evidence as it was too remote and speculative.

¶ 56       "A reviewing court will not disturb the trial court's decision regarding the admission of evidence at trial absent a clear abuse of discretion." *People v. Robinson*, 217 Ill. 2d 43, 62, 838 N.E.2d 930, 941 (2005). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Caffey*, 205 Ill. 2d 52, 89, 792 N.E.2d 1163, 1188 (2001).

¶ 57       "An accused in a criminal case may offer evidence tending to show that someone else committed the charged offense." *People v. Beaman*, 229 Ill. 2d 56, 75, 890 N.E.2d 500, 511 (2008). That right, however, "is not without limitations." *People v. Ward*, 101 Ill. 2d 443, 455, 463 N.E.2d 696, 701 (1984). "[I]f the evidence is too remote or too speculative, or if it fails to link a third person with the commission of the crime, then the trial court should exclude the evidence." (Internal quotation marks omitted.) *People v. Kelley*, 2019 IL App (4th) 160598, ¶ 113,

133 N.E.3d 641.

¶ 58 In this case, defendant sought to present evidence suggesting a man who had attacked and sexually assaulted a woman near the marital residence prior to Sheryl's death may have committed the alleged crimes against Sheryl. In an attempt to establish the requisite link between the perpetrator of the crimes in the prior case with the perpetrator of the crimes against Sheryl, defendant asserted the similarities in the crimes committed in both cases established a pattern of criminal behavior so distinctive that the separate crimes could be recognized as the handiwork of the same person.

¶ 59 In the prior case, the perpetrator attacked and subdued the victim by placing her in a chokehold while she was jogging alone on a public road during the day and made no efforts to conceal the fact the crimes had been committed. Conversely, in this case the perpetrator attacked and manually strangled Sheryl to death while she was at home with her children at night and made great efforts to conceal the fact the crimes had been committed. We, like the trial court, find any similarities in the crimes committed were insufficient to link them together to suggest a common perpetrator. Absent any other showing connecting the perpetrator of the crimes in the prior case with the crimes committed against Sheryl, we cannot say the trial court abused its discretion in denying defendant's request to introduce evidence of the prior case.

¶ 60 III. CONCLUSION

¶ 61 We affirm the trial court's judgment.

¶ 62 Affirmed.