2021 IL App (1st) 200657-U

No. 1-20-0657

Order filed March 25, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 11205 |
| | ) | |
| TIMOTHY JONES, | ) | Honorable |
| | ) | Thaddeus L. Wilson, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Justices Reyes and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's summary dismissal of defendant's *pro se* postconviction petition is affirmed where the petition did not allege the gist of claims for ineffective assistance of counsel or a discovery violation.

¶ 2    Defendant Timothy Jones appeals from the circuit court's summary dismissal of his *pro se*

petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West Supp.

2019)). On appeal, defendant argues that his petition alleged the gist of claims for ineffective

assistance of counsel for failure to procure certain documents in discovery and that the State violated the discovery rules established in *Brady v. Maryland*, 373 U.S. 83 (1963). We affirm.[1]

¶ 3        Defendant was charged by indictment with 20 counts, including home invasion, armed robbery, residential burglary, and counts of first degree murder predicated on each of those three charges, related to an incident on May 8, 2013.

¶ 4        We set out the facts from defendant's February 2015 jury trial in our order on direct appeal, and only include here those facts relevant to defendant's claims in the present appeal. See *People v. Jones*, 2018 IL App (1st) 151778-U (unpublished order under Illinois Supreme Court Rule 23).

¶ 5        At trial, Christina Davis testified that defendant is her cousin. On May 8, 2013, she gave defendant the keys to her vehicle.

¶ 6        Charese Taylor testified that she had a prior conviction for aggravated battery. On May 8, 2013, she lived in an apartment on the 7800 block of South Ellis in Chicago with her boyfriend Lee Davis and his daughter. That day, Taylor left Davis and his daughter in the apartment to meet Davis's mother and sister to go shopping. She walked to the end of the hallway, and saw two men she did not know outside of the building's security door. The men entered the hallway when Taylor opened the door. Before Taylor exited the building, she heard the men knock on her apartment door, then heard "a little tussle" and someone say "[g]et down." She called 911.

¶ 7        Taylor returned to her apartment's front door, but it was locked and she did not have her keys. She hit the door and yelled for the occupants to open it, and when they did not she went to the front of the building to await the police. Prior to their arrival, Taylor observed the two men exit

_____

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

her apartment and run from the building. One of the men, whom she identified in court as defendant, held a shoebox. She initially ran behind them, but then noticed police officers arrive. Taylor told them that the men ran towards 78th Street. The officers pursued the men in their vehicle. On cross-examination, Taylor agreed that she did not see defendant or the other man with a firearm.

¶ 8     Davis testified that he and his daughter remained in the apartment during the burglary while Taylor was outside. He identified defendant in court as one of the men who entered. Defendant's companion had a firearm. Eventually, Davis heard Taylor screaming from outside the apartment. Defendant took Davis's shoes, tablet, phone, bankcards, and $93 in cash, and the men fled. A police officer arrived, and Davis told the officer the direction in which the men ran. He received his items back later that day.

¶ 9     Chicago police officer Ronald Pittman testified that he responded to the incident and spoke to Taylor outside of the building. She described the burglars and said they were "running northbound down Ellis toward the park." Pittman looked in that direction, saw two men, and pursued in his vehicle. The men ran eastbound through Grand Crossing Park, and defendant, whom Pittman identified in court, had a firearm in his right hand. The men entered a vehicle, where a third individual was already present, and drove away. When the vehicle reached the corner of 77th Street and Dobson Avenue, it "made a wide right turn and hit the curb," then stopped. Pittman exited his vehicle and told the men to raise their hands. Defendant went to the ground, but the other two men ran away, one northbound and the other southbound. Defendant then stood, re-entered the vehicle, and drove onto Greenwood Avenue.

¶ 10    Pittman followed defendant's vehicle northbound on Greenwood, then eastbound on 76th Street and through a red light on South Chicago Avenue. Another police vehicle driven by Chicago police officer James Sivicek arrived and pulled directly behind defendant and ahead of Pittman. During the pursuit, defendant ran a red light at 76th and Yates Avenue. When Sivicek pursued through the intersection, a traffic accident occurred involving Sivicek's vehicle and two other vehicles, though Pittman did not see the incident itself. Pittman lost sight of defendant at this point, but eventually learned he was arrested.

¶ 11    Sivicek testified that he and his partner Officer Jairo Valeriano responded to the incident in a marked police vehicle and joined the pursuit of defendant's vehicle. During the pursuit, Sivicek saw defendant's vehicle exit an alley and drive eastbound on 76th, and Sivicek pulled immediately behind the vehicle. Sivicek's lights and sirens were active. Defendant's vehicle "accelerated to a high rate of speed," and he drove through several intersections against red lights, with Sivicek and Valeriano in pursuit. At 76th and Yates, defendant ran another red light. As Sivicek followed, a blue vehicle entered the intersection and collided with Sivicek's vehicle, despite Sivicek's attempts to brake. The police vehicle "started spinning," then stopped in the intersection, at which point Sivicek realized a silver vehicle had also been involved in the collision. Based on video Sivicek viewed later in the investigation, he learned that the blue vehicle struck the silver vehicle after first colliding with Sivicek's vehicle. Immediately following the collision, Sivicek determined that the woman driving the blue vehicle, Jacqueline Reynolds, was "unresponsive." He attempted CPR, then an ambulance arrived and took her to the hospital, where she later died.

¶ 12    On cross-examination, Sivicek estimated that he and defendant drove at similar speeds through the intersection just prior to the collision. Sivicek believed it was "appropriate" for him to enter the intersection in pursuit of defendant against the red light based on the Chicago Police Department General Order 603-03-01, which requires officers to consider the totality of the circumstances and balance "the seriousness of the crime" against "the amount of inherent danger" when deciding whether to engage in a high speed pursuit.

¶ 13    Valeriano testified that during the pursuit, defendant's vehicle exceeded the speed limit and traveled 45 to 60 miles an hour. At each intersection Valeriano and Sivicek entered while pursuing defendant, they "reduce[d] speed" and "clear[ed] the intersection," not entering until "it was reasonable and safe," at which time they "would enter the intersection and pick up speed for pursuit." When their vehicle entered the intersection of 76th and Yates, defendant's vehicle was traveling 50 to 65 miles an hour. Sivicek reduced speed and waited until the intersection was clear, then entered the intersection, at which time the blue vehicle "failed to yield for [the vehicle's] lights and sirens." Valeriano lost consciousness briefly due to the collision.

¶ 14    Glynn Ford testified that he had prior convictions for theft, forgery, and aggravated fleeing and eluding. On May 8, 2013, he was driving the silver vehicle involved in the collision. Ford was first in line at the red light at 76th and Yates, heading west, and saw a black vehicle drive east through the red light, followed by a police vehicle with its emergency lights activated. As the police vehicle crossed the intersection, it hit the blue vehicle, which then hit Ford's vehicle. His airbags deployed, and he was not injured. On cross-examination, Ford stated that he believed the police vehicle traveled faster than 30 miles an hour through the intersection.

¶ 15    Taylor Hurt testified that on May 8, 2013, she was working as a paramedic for the Chicago Fire Department and responded to the collision. She tended to Reynolds, who had a serious head injury. Hurt and her partner placed Reynolds in an ambulance and brought her to the hospital.

¶ 16    The State entered a stipulation that if called, Dr. Kirsten Engel would testify that she treated Reynolds on May 8, 2013, and that Reynolds was pronounced dead 14 minutes after her arrival at the hospital. The State entered another stipulation that if called, Dr. Stephen Cina would testify that he performed Reynolds's autopsy and determined her cause of death was multiple blunt force injuries due to an accidental motor vehicle collision.

¶ 17    Chicago police officer Sellers Williams testified that he was involved in the pursuit and was located eight or nine blocks east of the intersection at the time of the collision. Following the collision, Williams saw a black vehicle that matched a description of defendant's vehicle proceed northbound, and Williams pursued. At some point, Williams lost sight of the vehicle, but shortly thereafter he saw an individual walking on the street who "matched the description of the person involved in the home invasion." Williams detained the person, asked his name, and placed him in his police vehicle. Shortly thereafter, Williams received information relayed over police radio regarding a driver's license, including the suspect's name, which matched what the man in his vehicle told him. Williams then arrested the person, whom he identified in court as defendant. Later, Williams drove defendant to the 7800 block of South Ellis, where a "witness" and a "victim" identified him.

¶ 18    Chicago police sergeant Patrick McKenzie testified that on May 8, 2013, he was on duty at Hirsch Metropolitan High School, located near the 7800 block of South Ellis, when he overheard a police radio report of a home invasion in the area. McKenzie responded to the location and

interacted with Davis and Taylor. While there, someone gave McKenzie a driver's license, the information on which he relayed over the police radio. McKenzie identified defendant in court as the man depicted on the driver's license. Later, McKenzie was present when Williams arrived with defendant for a showup, in which Taylor and Davis identified defendant.

¶ 19     Chicago police officer Ricardo Sanchez testified that on May 8, 2013, he "preserve[d]" defendant's vehicle "for evidence" until an evidence technician arrived.

¶ 20     William Stec, an evidence technician for the Chicago Police Department, testified that he investigated defendant's vehicle and noted damage to the right and left front fender. Stec photographed the vehicle and recovered items from inside, including a shoe box containing a tablet, phone, and shoes. Stec also investigated the apartment on the 7800 block of South Ellis, where he photographed the scene.

¶ 21     Chicago police detective Curtis Thomas testified that on May 8, 2013, he responded to the report of the burglary, and while en route, overheard a description of the offender over police radio. He also learned of the collision at 76th and Yates over the radio, and responded to that location. Thomas obtained surveillance video of the collision and from the 7800 block of South Ellis during the ensuing investigation. Later, Thomas interacted with defendant at the police station. Thomas Mirandized defendant, who agreed to speak. The interview was recorded, and the State published portions to the jury, along with a transcript of those portions. Neither the video nor the transcript appear in the record on appeal.

¶ 22     Defendant testified that he knew Davis from high school and they had participated in a credit card fraud scheme together. On May 8, 2013, defendant and Tremaine Scott, who was also involved in the scheme, went to Davis's apartment because he owed them money. Defendant also

knew Taylor. Davis let defendant and Scott into the apartment. Scott and Davis started "tussling" when Davis said he did not have the money. While in the apartment, defendant took a shoebox because he believed it might contain money. Davis directed him to the box. Scott took a tablet and phone and put them in the box. At some point, Davis said he would retrieve a firearm, causing Scott and defendant to run from the apartment. Neither defendant nor Scott had a firearm at any point during the incident.

¶ 23   Scott and defendant ran to their vehicle, where a third man, "John," was waiting in the driver's seat. John drove the vehicle away, but at some point, he crashed into a parked vehicle, and Pittman arrived. John and Scott ran away, and defendant entered the driver's seat and drove away. During the ensuing pursuit, defendant ran a red light at 76th and Yates. He did not hear an accident occur behind him, and only learned that one occurred later at the police station. At some point, he parked the vehicle and started walking, and shortly thereafter, an officer stopped him, placed him in the back of the police vehicle, and drove him back to the 7800 block of South Ellis, where Taylor and Davis identified him.

¶ 24   On cross-examination, defendant acknowledged that following the incident he told the police he did not know Davis, but claimed his "whole interview was probably a lie to the police, honestly." During the pursuit, he honked his horn and slowed down as he passed through intersections. He denied losing his driver's license, and claimed it was in the glove box of the vehicle throughout the incident.

¶ 25   Following argument, the jury found defendant not guilty of home invasion, armed robbery, and felony murder based on either offense, but guilty of residential burglary and felony murder based on residential burglary.

¶ 26    At a later proceeding, the court denied defendant's motion for a new trial, and after a hearing, merged the finding of guilt for residential burglary into the felony murder count (720 ILCS 5/9-1(a)(3) (West 2012)) and sentenced defendant to 28 years' imprisonment. Defendant did not file a motion to reconsider sentence.

¶ 27    Defendant appealed, arguing that trial counsel was ineffective for failing to request a jury instruction on intervening cause respecting felony murder, the trial court gave an improper nonpattern jury instruction regarding felony murder, the trial improperly instructed the jury on the felony murder escape rule, his sentence was excessive, and the felony murder statute violated defendant's due process rights. We affirmed. *Jones*, 2018 IL App (1st) 151778-U (unpublished order under Illinois Supreme Court Rule 23).

¶ 28    On December 2, 2019, defendant filed a *pro se* postconviction petition, claiming, in relevant part, that the State violated *Brady* by failing to disclose a report of the Traffic Review Board (TRB) and other unspecified materials, and trial counsel was ineffective for not discovering the materials the State allegedly did not produce. Defendant attached (1) a TRB report dated March 5, 2017, finding that Sivicek violated Chicago Police Department General Order G03-03-01 and recommending Sivicek receive a reprimand and attend driving school; (2) an undated expert witness disclosure from Reynolds's estate's civil lawsuit against Sivicek, Valeriano, and the City of Chicago; (3) an excerpt from Sivicek's deposition in that matter, which defendant lists as given on August 23, 2016, though the excerpt itself is undated, wherein Sivicek stated that he was not suspended or reprimanded as a result of the incident and did not know if the TRB investigated the incident; and (4) and an October 18, 2017 judgment order by the circuit court in the civil matter entering judgment for Reynold's estate in the amount of $3.5 million plus costs.

¶ 29    On February 21, 2020, the circuit court summarily dismissed the petition, finding in relevant part that defendant could not show prejudice from any alleged errors by counsel because none of the claimed errors refuted the evidence that defendant's conduct proximately caused Reynolds's death, and the documents defendant referenced were not available prior to trial, obviating any *Brady* claims regarding their production.

¶ 30    On appeal, defendant argues that the circuit court erred by dismissing his petition as frivolous and without merit. Specifically, defendant contends that the circuit court mistakenly rejected his claims of ineffective assistance and a *Brady* violation on the basis that the discovery materials at issue did not exist at or prior to his criminal trial because Reynolds's estate filed the civil lawsuit in June 2013, before defendant's trial commenced, and the TRB decision likely resulted from "a long protracted procedure." Based on the foregoing, defendant argues that his petition raised the gist of a constitutional claim.

¶ 31    The Act provides criminal defendants a means to challenge their conviction on the grounds that it violates their constitutional rights. *People v. Johnson*, 2017 IL 120310, ¶ 14. The circuit court considers a petition under the Act in three stages. *Id.* At the first stage, a defendant need only present the "gist" of a constitutional claim, but this does not excuse a defendant from providing some factual support for his claims. *People v. Allen*, 2015 IL 113135, ¶ 24. If the defendant fails to do so, the petition is subject to summary dismissal on the basis that it is frivolous or patently without merit. 725 ILCS 5/122-1(a-5) (West Supp. 2019). We review the summary dismissal of a postconviction petition at the first stage *de novo*. *Allen*, 2015 IL 113135, ¶ 19.

¶ 32    Defendant's brief generally alleges that because relevant discovery material existed that defendant did not receive prior to trial, his trial counsel was ineffective for failing to procure the materials, and the State committed a *Brady* violation by not producing the material.

¶ 33    Where a defendant claims ineffective assistance of counsel, he must demonstrate deficient conduct and prejudice. *People v. Hodges*, 234 Ill. 2d 1, 17. At the first stage of postconviction review, the defendant's petition need only show arguably deficient conduct and arguable prejudice. *Id.* A claim based on counsel's failure to investigate is assessed based on reasonableness and counsel's strategy decisions are entitled to deference, and whether the alleged failure to investigate prejudiced defendant is determined based on the value of the alleged evidence that counsel failed to present and the closeness of the trial evidence. See *People v. Lewis*, 2017 IL App (1st) 150070, ¶ 18.

¶ 34    Pursuant to *Brady*, the State "has an affirmative duty in a criminal prosecution to disclose evidence favorable to a defendant, where the evidence is material either to guilt or to punishment." *People v. Harris*, 206 Ill. 2d 1, 50 (2002). To establish a *Brady* claim, the defendant must show that the undisclosed evidence is exculpatory or impeaching, the evidence was suppressed by the State either willfully or inadvertently, and the failure to disclose was prejudicial. *People v. Beaman*, 229 Ill. 2d 56, 73-74 (2008).

¶ 35    Here, the circuit court dismissed defendant's ineffective assistance and *Brady* arguments in relevant part because the only specific materials defendant referenced were created after his trial. The record supports this conclusion, as trial concluded in February 2015, but the only specific materials defendant references in his petition were either created in 2016 or 2017, or are undated. While defendant argues that the Reynolds's estate filed suit on June 13, 2013, prior to trial, this

argument is insufficient to establish that the State withheld any particular discovery material because the petition lacks any allegations regarding particular discovery materials. See *Hodges*, 234 Ill. 2d at 10. Thus, defendant's petition fails to allege that any relevant discovery material existed but was either withheld by the State or not procured by trial counsel due to unreasonable and deficient conduct.

¶ 36    Accordingly, we agree with the circuit court that defendant's petition does not state the gist of a *Brady* claim because defendant's petition fails to allege that the State willfully or inadvertently suppressed evidence. See *Beaman*, 229 Ill. 2d at 73-74; see also *People v. Tyler*, 2015 IL App (1st) 123470, ¶¶ 210-11 (finding the State did not violate *Brady* respecting evidence that did not exist prior to trial because it could not suppress evidence of which it was not aware). Similarly, defendant's ineffective assistance claim fails because defendant's petition does not allege what conduct counsel engaged in or failed to engage in that was unreasonable with respect to any purported discovery material that he should have, or could have, procured, but did not.

¶ 37    For the above reasons, the circuit court's summary dismissal is affirmed.

¶ 38    Affirmed.